**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF TEXAS**
**HOUSTON DIVISION**

| | | |
|---|---|---|
| **IN RE:** | § | |
| | § | |
| **LAWRENCE J. WEDEKIND** | § | **Case No. 09-32057-H4-11** |
| | § | **(Chapter 11)** |
| Debtor. | § | |

**DISCLOSURE STATEMENT TO THE**

**PLAN OF REORGANIZATION OF**

**LAWRENCE J. WEDEKIND**

**PROPOSED BY THE**

**DEBTOR ON**

**NOVEMBER 25, 2009**

**BEFORE**
**THE HONORABLE JEFF BOHM**
**UNITED STATES BANKRUPTCY JUDGE**

**LAWRENCE J. WEDEKIND**
**DISCLOSURE STATEMENT**
**DATED:  NOVEMBER 25, 2009**

# TABLE OF CONTENTS

| | |
|---|---|
| Introduction | Page 1 |
| Disclaimers | Page 2 |
| Summary of Original Plan | Page 4 |
| Overview of Original Plan | Page 4 |
| Summary Table of All Classes of Creditors | Page 5 |
| Equity Security Holder | Page 6 |
| Treatment of Claims | Page 7 |
| Voting Procedures and Requirements | Page 11 |
| Biography of the Debtor | Page 17 |
| Nature of the Debtor's Business | Page 21 |
| Sources of Information | Page 22 |
| Evaluation and Description of Significant Assets | Page 22 |
| Pre-Petition Operations and Events Leading To the Filing of the Bankruptcy | Page 23 |
| Changes in the Debtor's Operations, Present Condition of the Debtor and Chapter 11 Operations | Page 23 |
| Anticipated Future of the Debtor | Page 24 |
| Affiliates | Page 24 |
| Transfers | Page 25 |
| Pending Litigation Concerning the Debtor | Page 26 |
| Prospective & Future Litigation | Page 27 |
| Claims of Creditors: | Page 27 |
| Class 1 Administrative Claims | Page 27 |
| Class 2 Secured Claims | Page 29 |
| Class 3 Priority Claims | Page 30 |
| Class 4 Unsecured Administrative Convenience Class | Page 31 |
| Class 5 General Unsecured Claims | Page 31 |
| Financial Matters | Page 33 |
| Financial Statement and Accounting Method | Page 33 |
| Cash Receipts, Projections and Assumptions | Page 33 |
| New Equity | Page 34 |
| Ownership And Future Management of the Debtor | Page 34 |
| Ownership | Page 34 |
| Management | Page 34 |
| Risks to Creditors, Failure to Confirm the Original Plan and Liquidation Analysis | Page 35 |
| Risks to Creditors | Page 35 |
| Failure To Confirm Original Plan | Page 35 |
| Liquidation Analysis | Page 36 |
| Federal Tax Consequences of The Original Plan | Page 38 |

**EXHIBITS**

| |
|---|
| **Exhibit A** – Debtor's Plan of Reorganization dated November 25, 2009 |
| **Exhibit B** - Financial Report for the Month of July, 2009 |
| **Exhibit C** – Financial Projections 2010-2014 |

## I. INTRODUCTION

On March 31, 2009, LAWRENCE J. WEDEKIND, ("Debtor"), commenced this case by filing a voluntary petition for relief under Chapter 11, Title 11 of the United States Code (the "Bankruptcy Code" or "Code"). On November 25, 2009, the Debtor filed his proposed Original Plan of Reorganization (the "Plan") with his Original Disclosure Statement pursuant to Rule 3016(c) of the Federal Rules of Bankruptcy Procedure (hereafter referred to as the "Disclosure Statement"). Under the provisions of 11 U.S.C. §1125, a court-approved Disclosure Statement is required to be provided by a Plan's proponent in connection with, and prior to, the solicitation of acceptances or rejections of a Plan of Reorganization.

On _____ 20____, after notice and a hearing, the Court approved this Disclosure Statement (hereafter the "Disclosure Statement") as containing such information as would enable a hypothetical, reasonable investor (typical of the holders of claims being solicited in the Plan) to make an adequately informed judgment in exercising his, her or its right to vote to either accept or reject the Plan. The Court's approval of this, or any other Disclosure Statement, **does** **not** constitute a determination by the Court of the merits of the Plan.

As a creditor, your vote is important. The Plan may be confirmed by the Court if it is accepted by at least the holders of two-thirds (2/3) in amount, and more than one-half (1/2) in number, of claims in each "impaired class" (as defined herein) of claims actually voting on the Plan. In the event the requisite acceptances are not obtained, the Court may nevertheless confirm the Plan if it finds that the Plan accords fair and equitable treatment to the class or classes rejecting it.  A ballot for your use in indicating your acceptance or rejection of the Plan is included in these materials, together with a copy of the Order of the Court approving this Disclosure Statement.

_____

**THE ENCLOSED BALLOT MUST BE COMPLETED
AND RETURNED TO JAMES R. CLARK,
ATTORNEY IN CHARGE FOR DEBTOR,
4545 MT. VERNON
HOUSTON, TEXAS 77006
(713) 532-1300 / (713) 532-5505 [FAX]**

**BY _____, 2010, TO BE COUNTED**

_____

In reviewing this Disclosure Statement and the accompanying Plan, you should be aware that many of the terms employed throughout have special meanings. The terms used throughout the Plan and this Disclosure Statement, which have special meanings, have been defined in Article I of the Plan. Unless otherwise defined in this Disclosure Statement, all such terms shall have the same meanings as set forth in Article I of the Original Plan. Some terms which may have special meanings, but which are used only in this Disclosure Statement, are defined herein.

In addition to the text, this Disclosure Statement includes a number of exhibits. The exhibits are important and integral parts of the Disclosure Statement and are intended to enhance the reader's overall knowledge of the Debtor and the Original Plan.

## II. DISCLAIMERS

**NO REPRESENTATIONS CONCERNING THIS DEBTOR ARE AUTHORIZED OTHER THAN AS SET FORTH IN THIS STATEMENT. ANY REPRESENTATIONS OR INDUCEMENTS MADE TO SECURE YOUR ACCEPTANCE THAT ARE NOT CONTAINED IN THIS DISCLOSURE STATEMENT SHOULD NOT BE RELIED UPON BY YOU IN ARRIVING AT YOUR VOTING DECISION, AND SUCH ADDITIONAL REPRESENTATIONS AND INDUCEMENTS SHOULD BE REPORTED TO THE COURT FOR ANY TYPE OF ACTION THAT MAY BE DEEMED APPROPRIATE BY THE BANKRUPTCY JUDGE.**

**THE FINANCIAL INFORMATION CONTAINED HEREIN IS ACCURATE TO THE BEST OF THE KNOWLEDGE AND BELIEF OF THE DEBTOR. ALTHOUGH GREAT EFFORT HAS BEEN MADE TO PROVIDE ADEQUATE INFORMATION HEREIN, THE DEBTOR IS UNABLE TO WARRANT OR REPRESENT THAT SUCH INFORMATION IS WITHOUT**

ANY INACCURACY. CERTAIN STATEMENTS IN THIS DISCLOSURE STATEMENT BECOME APPLICABLE ONLY WHEN, AND IF, THIS DISCLOSURE STATEMENT IS APPROVED BY THE COURT. WHEN AND IF THE COURT APPROVES THIS DISCLOSURE STATEMENT, YOU WILL BE RECEIVING FURTHER NOTICE OF SUCH APPROVAL.

THIS DISCLOSURE STATEMENTCONTAINS ONLY A SUMMARY OF THE ORIGINAL PLAN. THE ORIGINAL PLAN, WHICH ACCOMPANIES THIS DISCLOSURE STATEMENT, IS AN INTEGRAL PART OF THIS DISCLOSURE STATEMENT AND EACH CREDITOR IS URGED TO REVIEW THE ORIGINAL PLAN SEPARATELY PRIOR TO VOTING ON IT. THE DEBTOR MAKES NO REPRESENTATIONS WITH RESPECT TO THE EFFECTS OF TAXATION (STATE OR FEDERAL) ON THE INTEREST HOLDERS OR CREDITORS WITH RESPECT TO THE TREATMENT OF THEIR CLAIMS OR INTERESTS UNDER THE ORIGINAL PLAN, AND NO SUCH REPRESENTATIONS ARE AUTHORIZED BY THE DEBTOR. CREDITORS AND INTEREST HOLDERS ARE ENCOURAGED TO SEEK THE ADVICE OF THEIR OWN PROFESSIONAL TAX ADVISORS IF THEY HAVE ANY SUCH QUESTIONS.

THE ORDER OF CONFIRMATION OF THE ORIGINAL PLAN WILL DISCHARGE THE REORGANIZED DEBTOR FROM ALL OF HIS PRE-FILING DATE DEBTS AND INTERESTS BY VIRTUE OF SECTION 1141(d) OF THE BANKRUPTCY CODE. NEVERTHELESS, CONFIRMATION MAKES THE ORIGINAL PLAN BINDING UPON THE REORGANIZED DEBTOR, AND ALL CREDITORS AND OTHER PARTIES-IN-INTEREST, REGARDLESS OF WHETHER OR NOT THEY HAVE ACCEPTED THE ORIGINAL PLAN. PURSUANT TO SECTION 1141(d)(1)(B) OF THE BANKRUPTCY CODE, CONFIRMATION OF THE ORIGINAL PLAN WILL RESULT IN THE TERMINATION OF ALL RIGHTS AND INTERESTS OF CREDITORS AND INTEREST HOLDERS OF THE DEBTOR AS PROVIDED IN THE ORIGINAL PLAN. IT FORMS A BINDING CONTRACT ON ALL THE CREDITORS AND PARTIES IN INTEREST.

ALL INFORMATION ON CURRENT LITIGATION BROUGHT BY OR DEFENDED BY THE DEBTOR IS BASED IN WHOLE, OR IN PART, ON REPORTS AND INFORMATION FURNISHED BY THE DEBTOR, OR HIS COUNSEL, OR OTHERS INVOLVED THEREIN, WHO HAVE FURNISHED WHAT THE DEBTOR BELIEVES TO BE REASONABLY RELIABLE INFORMATION. THE STATEMENTS CONTAINED IN THIS DISCLOSURE STATEMENT ARE MADE AS OF THE DATE HEREOF, UNLESS ANOTHER TIME IS SPECIFIED HEREIN. THE DELIVERY OF THIS DISCLOSURE STATEMENT SHALL NOT, UNDER ANY CIRCUMSTANCES, CREATE AN IMPLICATION THAT THERE HAS

**NOT BEEN ANY CHANGE IN THE FACTS SET FORTH HEREIN SINCE THE DATE HEREOF.**

**THE APPROVAL BY THE UNITED STATES BANKRUPTCY COURT OF THE DISCLOSURE STATEMENT DOES NOT CONSTITUTE AN ENDORSEMENT BY THE BANKRUPTCY COURT OF THE ORIGINAL PLAN OR A GUARANTY OF THE ACCURACY AND COMPLETENESS OF THE INFORMATION CONTAINED THEREIN. THE COURT RULES ON THE ADEQUACY OF THE INFORMATION FOR PURPOSES OF MAKING AN INFORMED VOTE ON THE ORIGINAL PLAN OF REORGANIZATION BY THE CREDITORS AND OTHER CLAIMANTS.**

### III. SUMMARY OF THE ORIGINAL PLAN

A brief summary of the Original Plan is set forth below.  This summary does not purport to be a complete restatement of the Original Plan and should not be relied upon by you for voting purposes.  All creditors and parties-in-interest are urged to read the Original Plan in full before voting to accept or reject the Original Plan.  A true and correct copy of the Debtor's Original Plan of Reorganization is attached hereto as **Exhibit "A."** Creditors and parties-in-interest are further urged to consult with their respective legal counsel or other qualified advisor prior to voting to accept or reject the Original Plan.

### A.  Overview of the Original Plan

The Original Plan contemplates that the Debtor, Lawrence J. Wedekind, individually, will retain his current form of doing business as an individual and corporate officer, and will continue to operate the IntegraNet Physician Resource, Inc., an Independent Physician Organization ("IPO"), which is a medical management business in Houston, Texas for his employer; and, after the payment of his personal costs and living expenses, including personal property taxes and current income taxes, the Debtor will employ the entire remainder of his future net income derived from his

earnings, as well as possibly from the sale of certain assets, to fund the Original Plan for the satisfaction of his creditor's claims as provided therein.

The money obtained from the Debtor's employment which is intended for use in the payment of creditors' claims is defined as "Net Distributable Income" in paragraph 1.14 of the Original Plan.

Other than the Net Distributable Income from the Debtor's employment and the possible sale of certain assets, as well as any recovery on receivables owed to Dickerson Memorial Hospital, Ltd., the Original Plan does not anticipate any other source of funds being available for the payment of creditors' claims.  The Original Plan designates five (5) classes of creditors, including those classes whose members are limited to the holders of administrative and priority claims. Creditors listed in Classes 1, 2, & 3 of all creditors designated under the Original Plan, are considered **unimpaired** within the meaning of § 1124 of the Code.  The treatment provided under the Original Plan to the remaining holders of claims in Classes 4 & 5, being the impaired Classes, is discussed in detailed below.

### B. Summary of All Classes of Creditors & Equity Holder

#### Summary Table of All Classes of Creditors

| Class | Claimant | Amount | | Claim Status |
|-------|----------|--------|---|-------------|
| | **Administrative Claims** | | | |
| 1 | United States Trustee | $2,000.00 | | Based on amounts disbursed |
| 1 | James R. Clark | $30,000.00 | (a) | Subject to fee application |
| 1 | Michael P. Jayson, CPA | $15,000.00 | (a) | Subject to fee application |
| | **Subtotal Class 1 claims** | **$47,000.00** | | |
| | | | | |
| | **Secured Claims** | | | |
| 2 | Internal Revenue Service | $2,264,769.46 | | Objection to be filed |
| | **Subtotal Class 2 claims** | **$2,264,769.46** | | |

**Priority Claims**

| | | | |
|---|---|---|---|
| 3 | Internal Revenue Service | <u>$34,056.03</u> | Allowed as filed |
| | **Subtotal Class 3 claims** | **$34,056.03** | |

**Unsecured Administrative-<br> Convenience Class**

| | | | |
|---|---|---|---|
| 4 | American Express Centurion Bank | $8,848.11 | Allowed as filed |
| 4 | American Express Travel Related Services Co., Inc. | $1,824.84 | Allowed as filed |
| 4 | American Express Travel Related Services Co., Inc. | $380.64 | Allowed as filed |
| 4 | Omnibank, USA | <u>$940.05</u> | Allowed as filed |
| | **Subtotal Class 4 claims** | **$11,93.64** | |

**Unsecured General Claims**

| | | | |
|---|---|---|---|
| 5 | David Mosig | $33,333.35 | Possible Objection |
| 5 | John Tatum | $355,211.11 | Allowed as filed |
| 5 | Omnibank, USA | $1,316,162.45 | Possible Objection |
| 5 | Omnibank, USA | <u>$577,785.95</u> | Possible Objection |
| | **Subtotal Class 5 claims** | **$2,282,492.86** | |

    **(a) Estimated**

## C.  <u>Equity Security Holder</u>

There are no equity security holders since the Debtor is an individual and not a separate legal entity.  Since the only person currently having an ownership interest in the Debtor is the individual Debtor himself, he is not being separately classified in a Class for disclosure purposes. He will retain only his exempt property as listed in his Bankruptcy Schedules to which no objection has ever been made, and a sufficient amount of his net income to live upon, and will devote the

remainder of his future net income for the payments due creditors under the Plan.  He will not be receiving any other form of distribution or compensation under the Plan.

### D.  <u>Treatment of Claims</u>

The treatment provided under the terms of the Original Plan to the holders of all claims, including administrative and priority claims shall be fully dispositive of the Debtor's liability therefor.

1.      **<u>Unimpaired Classes.</u>**  The holders of claims in Classes 1, 2 & 3 are not considered impaired under the Debtor's Original Plan, within the meaning of § 1124 of the Code.

a.      **<u>Administrative Claims</u>:**  Holders of claims in Class 1 are to be paid in cash and in full on the Effective Date of the Original Plan.  The holders of such claims are only the Debtor's attorney, accountant, and the United States Trustee for any unpaid quarterly Trustee's fees due for disbursements made by the Debtor but unpaid, or not yet due, as of the date of confirmation. The Debtor shall timely pay post-confirmation quarterly fees to the Office of the United States Trustee assessed pursuant to 28 U.S.C. § 1930(a)(6) until such time as this Bankruptcy Court enters a final decree closing this Chapter 11 case, or enters an order either converting this case to a case under Chapter 7 or dismissing this case.

b.      **<u>Class 2 Secured Claims</u>:**      The filed tax claims of only the Internal Revenue Service ("IRS") comprise this Class. The Debtor is married but files separate federal income tax returns from his spouse and is, thus, responsible only for his own personal income tax liability each year.  He will continue to file timely federal income tax returns and will pay any actual post-petition amounts determined on a current basis as such become due.  The Debtor owes no federal income taxes for any years preceding the date of filing of this Bankruptcy Case.

(1) The Secured Claim of the IRS, which is for Trust Fund Recovery Penalties related to unpaid employment taxes, is overstated as the Debtor has amended his Bankruptcy Schedules to reflect the inability to claim the right to assigned asset claims of Dickerson Memorial Hospital, Ltd. "Dickerson," a Texas Limited Partnership (see the more detailed discussion about Dickerson elsewhere herein for additional information) which had been a Debtor in a separate Chapter 7 proceeding that has now been dismissed.  These asset claims were recently evaluated in two Adversary Proceedings filed by the Debtor against agencies of the United States government and the end result was that such could not be advanced by this individual Debtor. The Adversary Proceedings were dismissed and those claims must be advanced by Dickerson. Accordingly, the Debtor contends that this claim of the IRS is mainly unsecured.

(2) The Debtor plans to object to this Claim as the Debtor does not have sufficient unencumbered assets to equal the amount claimed as secured by the IRS.  Once determined, this Claim will not be impaired under the Plan since this claim, to the extent allowed, will be satisfied in full via equal monthly payments with interest or a lump sum payment out of the special reserve account maintained at OmniBank at the direction of the Bankruptcy Court. The secured claim of the Internal Revenue Service ("IRS") is secured by one or more filed federal tax liens and will be paid from the anticipated net future income of the Debtor.  The IRS will retain its statutory liens and all of its rights until this claim is paid in full - including the right to charge interest at Three Percent (3%) simple interest per annum from the date of confirmation of the Debtor's Plan until paid. The final allowed claim, if not paid in a lump sum, will be fully paid over 120 months following the Petition Date with interest at Three Percent (3%) simple interest per annum.  The Debtor intends to object to this claim as the IRS has claimed a value in excess of the equity in all of the Debtor's assets that could be subject to a lien. The total value of the Debtor's

personal property assets, as listed on his amended Schedule B to his Bankruptcy Petition is now approximately $145,385.00 including the value of insurance policies (which may be secured to OmniBank) in the amount of approximately $93,000.00 and an exempt IRA of $12,000.00 as well as an educational custodian account of about $12,500.00.  Thus the Debtor believes that the IRS claim can only be considered secured to the remainder of his personal property worth approximately $30,885.00,

        c.     **Class 3 Priority Claim:**     The holder of this claim in Class 3 is only the Internal Revenue Service for the priority portion of its tax claim which is also derived from unpaid federal employment taxes originally due from Dickerson but assessed against the Debtor under what is known as the "Trust Fund Recovery Penalty." Since Dickerson is no longer operating, it will not be incurring any current or post-petition employment tax liabilities.  Accordingly, this Claim can only reflect Dickerson's pre-petition employment taxes.   The Debtor anticipates that some or all of the IRS' Class 2 Claim will be reclassified into this Class after the Debtor's objection to the IRS' Class 2 Claim is resolved.  The eventual allowed amount will be paid over 60 months from the Petition Date with interest at Three Percent (3%) simple interest per annum commencing on the Effective Date of the Plan. The Debtor anticipates and assumes that Dickerson will collect on a claim it has against the United States Department of Health and Human Services for what is known as transitional corridor payments ("TOP") and against the United States Federal Emergency Management Agency ("FEMA") for claims attributable to housing people during Hurricane Rita in 2005.   The amount to be collectible estimated at is $1,368,000.00 at a minimum, without regard to possible interest claims. The Debtor will request that he be given full credit by the IRS for payments and interest offsets which would result from crediting the amount these agencies should have paid when originally due. Accordingly, the Debtor, subject to

the resolution of his Objection to the IRS Secured Claim which will be filed, estimates that he will only owe the IRS no more than $600,000.00.

        3.     **Impaired General Unsecured Claims.**  The holders of claims in Class 4 & 5 are <u>impaired</u> under the Original Plan within the meaning of § 1124 of the Code.

        a.     **Class 4 Unsecured Administrative Convenience Claims.** The Debtor for administrative convenience has, arbitrarily, placed all general unsecured creditors holding claims valued or stated as $10,000.00 or less, in this Class. Each such creditor will receive the lesser of $2,000.00 or the actual amount of their claim, in a lump sum, in cash, and without interest within 60 days of the Effective Date of the Plan. Thereafter, they will receive no other payments from the Debtor.  The creditors listed in this Class will have the option to elect out of Class 4 and into Class 5 if they prefer to receive the Twelve Percent (12%) dividend on their claim, without interest, over the extended payment period of 120 months instead of the amount and period provided in Class 4. Once that election is made on the form of Ballot used for voting on the Debtor's Plan of Reorganization, it will be irrevocable.  The Debtor will not make any payments on claims which have been disputed and for which that creditor has not filed any proof of claim.

        b.     **Class  5 General Unsecured Claims.**      The filed Class 5 claims in excess of $2,282,492.86 are the only general unsecured claims. These are designated to be paid a Twelve Percent Dividend (12%) of their allowed claims, without interest, over a period of 120 months. The payments will commence on May 1, 2010. Each creditor will receive a pro rata payment of their claim over 120 months. The remaining claims in this Class, unless objected to, will be allowed as scheduled by the Debtor or as filed by the respective creditors.  These creditors also have the option to join the Administrative Convenience Class (Class 4) by indicating such election

on their ballot whereby they will only receive a maximum payment of $2,000.00 as described in Class 4.

### D. **Voting Procedures And Requirements**

1.      **Ballots**.  A ballot to be used for voting to accept or reject the Original Plan is being included along with the Original Plan and this Disclosure Statement that is sent to each creditor entitled to vote.  A voting ("impaired") creditor must review the ballot and specific instructions on it, vote to accept or reject the Original Plan, and return it to the address indicated on the ballot in order for that vote to be considered.  **Please note that only those ballots actually cast will be counted for acceptance or rejection of the Original Plan.**  Ballots received after the deadline to be set by the Court **will not be counted**.

2.      **Creditors Entitled To Vote**.  Any creditor whose claim is impaired under the Original Plan is entitled to vote if, either such claim has been scheduled by the Debtor and it is not listed as disputed, contingent, or unliquidated, or the creditor has filed a proof of claim on or before the last day set by the Bankruptcy Court for filing such a proof of claim (the "Bar Date") and such claim has not been objected to or contested by the Debtor.

(a)      The Court has previously set September 7, 2009 as the Bar Date for all claims to be filed by non-government creditors or parties in this Case.

(b)      Contested claims are not entitled to vote on the Original Plan, unless otherwise agreed to.  Any claim as to which an objection has been or will be filed and is still pending is not entitled to vote, unless the Bankruptcy Court temporarily allows the claim for the purpose of accepting or rejecting the Original Plan upon motion by the creditor whose claim has been objected to.  Any such motion must be heard and determined by the Bankruptcy Court prior to the date established by the Court as the voting deadline.  In addition, a creditor's vote may be

disregarded if the Bankruptcy Court determines that acceptance or rejection of the Original Plan by that creditor was not solicited or procured in good faith or in accordance with the provisions of the Bankruptcy Code.

3. **Definition of Impairment.** Under § 1124 of the Bankruptcy Code, a class of claims is impaired with respect to the Original Plan **unless**, with respect to each claim of the class, the Original Plan:

(a) leaves **unaltered** the legal, equitable, and contractual rights of the holder of the claim; or

(b) notwithstanding any contractual provisions or applicable law that entitles the holder of the claim to receive accelerated payment of its claim after the occurrence of a **default**;

(i) **cures such default** that occurs before or after the commencement of this case under the Bankruptcy Code, other than a default of the kind specified in § 365 (b) 2 of the Bankruptcy Code;

(ii) **reinstates the maturity** of such claim as it existed before the default;

(iii) **compensates** the holder of such claim for damages incurred as a result of reasonable reliance upon such contractual provision or applicable law; and

(iv) does not otherwise **alter the legal, equitable, or contractual rights** to which such claim entitles the holder of such claim or interest; or

(v) provides that, on the effective date, the holder of such claim receives, on account of such claim, cash equal to the allowed amount of such claim.

4. **Acceptance By A Class**. The Bankruptcy Code defines acceptance of an Original Plan of Reorganization by a class of claims as the acceptance by holders of 2/3rds in dollar

amount and a majority in number (51%) of the allowed claims of that class which **actually cast ballots** for acceptance or rejection of the Original Plan.  Therefore, there is no acceptance by a class if less than 2/3rds of the amount and majority in number of those creditors who or which **<u>actually vote</u>** accepts the Original Plan.  **The Debtor urges all eligible impaired creditors to vote for the Original Plan.**

     5.    **<u>Confirmation Hearing.</u>**     Section 1128 (a) of the Bankruptcy Code requires a hearing to be held to consider confirmation of the Debtor's Original Plan.  That Section allows any party in interest to object to confirmation of the Original Plan.  At the hearing to consider the adequacy of the Debtor's Disclosure Statement which will be held on a specific date, the Court will enter an Order to establish the time and date for the Confirmation Hearing, along with deadlines for creditors to both object to and vote upon the Debtor's Original Plan. **Unless an objection to confirmation is timely served and filed with the Bankruptcy Clerk by the date established by the Court, it will not be considered by the Bankruptcy Court. The Court will separately set a hearing to consider confirmation of the Original Plan which will be separately noticed to all creditors.**

     6.    **<u>Requirements For Confirmation Of The Original Plan.</u>**    At the actual Confirmation Hearing, the Bankruptcy Court shall determine whether the requirements of Section 1129 of the Bankruptcy Code have been satisfied, in which event the Bankruptcy Court shall enter an order confirming the Original Plan.  The general requirements of Section 1129, which are applicable, are as follows:

     (a)    The Original Plan complies with the applicable provisions of the Bankruptcy Code.

     (b)    The Debtor has complied with the applicable provisions of the Bankruptcy

Code.

(c)     The Original Plan has been proposed in good faith and not by any means forbidden by law.

(d)     Any payment made or to be made by the proponent, by the Debtor, or by a person issuing securities or acquiring property under the Original Plan, for services or for costs and expenses in or in connection with the case in connection with the Original Plan and incident to the case, has been approved by, or is subject to the approval of, the court as reasonable.

(e)     Debtor has disclosed the identity and affiliations of any individual proposed to serve, after confirmation of the Original Plan, as a director, or voting trustee of Debtor, an affiliate of Debtor participating in a Original Plan with the Debtor, or a successor to Debtor under the Original Plan, and the appointment to, or continuance in, such office of such individual, is consistent with the interests of creditors and with public policy, and Debtor has disclosed the identity of any insider that will be employed or retained by the reorganized Debtor and the nature of any compensation for such insider.

(f)     With respect to each class of impaired claims, either each holder of a claim of such class has accepted the Original Plan or will receive or retain under the Original Plan on account of such claim, property of a value, as of the effective date of the Original Plan, that is not less than the amount that such holder would receive or retain if the Debtor was liquidated on the effective date under Chapter 7 of the Bankruptcy Code.

(g)     Each class of claim or interest has either each accepted the Original Plan or is not impaired under it.

(h)     Except to the extent that a holder of a particular claim has agreed to a different treatment of such claim, the Original Plan provides that administration expenses and

priority claims (other than tax claims) will be paid in full at the effective date and that priority tax claims will receive on account of such claims deferred cash payments, over a period not exceeding six (6) years after the date of assessment of such claim, of a value, as of the effective date, equal to the allowed amount of such claim.

(i)     At least one class of claims has accepted the Original Plan, determined without including any acceptance of the Original Plan by any insider holding a claim of such class.

(j)     Confirmation of the Original Plan is not likely to be followed by liquidation, or the need for further financial reorganization of the Debtor or any successor to the Debtor under the Original Plan, unless such liquidation or reorganization is proposed in the Original Plan.

(k)     All fees payable under 28 U.S.C. § 1930, as determined by the Court at a hearing on confirmation of the Original Plan, have been paid, or the Original Plan provides for the payment of all such fees on the effective date of the Original Plan.

The Debtor believes that the Original Plan satisfies all of the statutory requirements of Chapter 11 of the Bankruptcy Code, that the Debtor has complied with, or will comply with, all of the requirements of Chapter 11, and that the proposal of the Original Plan is made in good faith and not by any means prohibited by law.

The Debtor contends that holders of all claims impaired under the Original Plan will receive or retain property having a present value, as of the Effective Date, in amounts not less than the amounts likely to be received if the Debtor was immediately liquidated under Chapter 7 of the Bankruptcy Code.  At the Confirmation Hearing, the Bankruptcy Court will determine whether creditors would receive greater distributions under the Original Plan than otherwise would be distributed to them in a liquidation under Chapter 7.

7.      **<u>Cram Down</u>**.  In the event any impaired class of claims in this Original Plan does not accept it, the Bankruptcy Court may still confirm the Original Plan at the request of Debtor, if, as to each impaired class which has not accepted the Original Plan, the Original Plan "does not discriminate unfairly" and "is fair and equitable."  An Original Plan of Reorganization does not discriminate unfairly within the meaning of the Bankruptcy Code if no class receives more than it is legally entitled to receive for its claims.

"Fair and equitable" has a different meaning for secured and unsecured claims.  With respect to secured claims, it means either (i) the impaired secured creditor retains its lien to the extent of its allowed claim and receives deferred cash payments at least equal to the allowed amount of its claim with a present value, as of the effective date, at least equal to the value of such creditors' interest in the property securing its lien; (ii) property subject to the lien of the impaired secured creditor is sold free and clear of that lien, with the lien attaching to the proceeds of the sale, and such lien proceeds must be treated in accordance with clauses (i) or (iii) hereof; or (iii) the impaired secured creditor realizes the "indubitable equivalent" of its claim under the Original Plan of Reorganization.

With respect to an unsecured claim, "fair and equitable" means either (i) each impaired unsecured creditor who receives or retains property of a value equal to the amount of its allowed claim; or (ii) the holders of claims or interests that are junior to the claim of the descending class will not receive any property under the Original Plan of Reorganization.

In the event one or more classes of impaired claims under the Original Plan rejects it, the Bankruptcy Court will determine at the Confirmation Hearing whether the Original Plan is fair and equitable and does not discriminate unfairly against any rejecting impaired class of claims.  All creditors and parties in interest will receive a separate written notice of the date and time set by the Bankruptcy Court to consider confirmation of the Debtor's Original Plan.  At that hearing the

Debtor will be called to testify and will provide evidence as to why the proposed Plan should be confirmed.

**III.**

**THE DEBTOR**

**A.  Biography of Lawrence J. Wedekind**

Mr. Wedekind was born and raised in Florida. He received his Bachelor of Science Degree from University of Florida in 1977.  He next received his Master Business Administration (M.B.A) & Master of Health Administration (M.H.H.A.) from the University of Florida in 1979.

Mr. Wedekind moved to Houston and began to develop the business model he is now involved in.  Mr. Wedekind, during more than 20 years of operating his own companies from (1986-2009) has been integrally involved in every facet of health care financing and delivery of healthcare within the Southeastern U.S. Market.

Mr. Wedekind's medical management business employer has mainly corporate clients. Numerous of his clients have relied upon his services for many years.  His detailed information follows:

**EDUCATION**
**Regulatory and continuing education in healthcare and healthcare technology-ONGOING**
**M.B.A. & M.H.H.A. - University of Florida, 1979**
**B.S. - University of Florida, 1977**


**BACKGROUND AND EXPERIENCE SUMMARY**
**During more than 20 years of operating his own companies (1986-2009), Larry Wedekind has been integrally involved in every facet of health care financing and the delivery of health care within the southeastern U.S. market. The various major projects**

17

that he has directed with their associated time frames are briefly described below.

1985-1986   - Mr. Wedekind led the development, construction, financing, and management of the Walter Reed Medical Building; a 46,000 sq. ft. medical mall in Garland, Texas. He achieved over 95% occupancy in this building within the first year, making this a very successful project.

- Led the development, financing, and operation of a physician-owned Cardiology Diagnostic Center in Garland, Texas. Twelve physician investors were brought into this investment opportunity. Their initial capital investment was returned to them from positive cash flow within 3 months of start-up operations. This was the first free Diagnostic Cardiology Center in Garland and was very successful.

- Led the development, financing, and operation of a physician-owned Imaging Center in Garland, Texas. Sixteen physician investors were brought into this investment into this investment opportunity and their initial investment was returned to them from positive cash flow within one (1) year. Again, a very successful center.

1987-1994   - He was the Contract Regional Director of six (6) hospitals in the Southeast for American Healthcare Management, Inc. ("AHM"). His primary responsibility was to form limited partnerships in each of these markets with the medical staff of each hospital in order to update equipment and facilities and more effectively compete with other area hospitals. When AHM unexpectedly filed for bankruptcy protection in 1988 on the West Coast, he was able to lease purchase one of these six hospitals from AHM, and was also able to terminate the regional director contract – see below.

- Lease Purchase of Wylie Community Hospital (Wylie, Texas) from AHM.

Mr. Wedekind formed a unique local physician and management owned company (L.P.) to lease purchase Wylie Community Hospital from AHM, (which was in Chapter 11 during the lease-purchase of the Wylie hospital). His corporation assumed the debt for the G.P. position, and many local physicians contributed cash equity in return for pro-rata limited partnership investments. His company also leased the facility and operated it as a Limited Partnership for 6 years, and he was CEO of the G.P. for this new entity for six (6) years. Since this hospital became very profitable under Larry's leadership, when the Landlord changed in 1993, the landlord company attempted to take back control of this hospital they had previously owned. After a protracted battle with the Landlord for control of the hospital, the hospital was sold to the Presbyterian Hospital System in 1994.

- During this timeframe, Mr. Wedekind also developed two Sports Medicine Rehab Centers and a Wellness Center associated with each rehab center. He then formed a company with other investors to take over the operations of two 50,000 sqft. super-health clubs in the Dallas area that had suffered from poor management in the past, (these clubs were located next to his newly developed rehab/wellness centers).

1994-1995   - He successfully reorganized a Ft. Worth, Texas hospital that had filed for bankruptcy protection. The bankruptcy court requested that Mr. Wedekind re-organize the Chapter 11 hospital on behalf of its creditors and the debtor in possession, and the 12 physician owners agreed to support his turn-around efforts. After approximately 11 months of work, the hospital became profitable, and his re-organization plan was approved. Mr. Wedekind then received a 5-year management contract offer from the debtor in possession. However, he turned down the employment offer in order to continue performing hospital turn-arounds in Texas through one

19

of his companies.

**1995-1996** - Mr. Wedekind successfully turned around a 99-bed hospital in Houston, Texas for the owners (one of the Doctor's Hospitals). This hospital was only 4 days away from losing its hospital license and paying a $500,000 fine to the Texas Department of Health for quality of care infractions. This is the day he began the turn-around at the request of the Texas Hospital Association. The owners were also losing approximately $120,000 per month and were cashing in pension fund money to make payroll upon his arrival. After convincing the TDH that he could improve the quality of care through Board and Medical Staff intervention, the licensure revocation and fines were delayed. Within three months after starting, the licensure revocation and fines were eliminated. The hospital became profitable again, and the owners were later able to sell the hospital operations to another group for a sizable profit and ongoing equity interest in the hospital.

**1996-2008** - Mr. Wedekind formed and developed **IntegraNet Physician Resources, Inc.** (IntegraNet) in 1996, and signed a multiyear contract with Blue Cross/Blue Shield for the management of Medicaid managed care lives for their HMO Blue subsidiary. He then signed another multiyear contract with Community Health Choice in 1997, and with UTMB and Evercare HMO's in 1998 and 2000 respectively. He also signed a major multi-year, multi-product contract with United Healthcare in 2004. Recently, he added 3 very large shared-risk Medicare Advantage HMO contracts starting in 2005, that have increased revenues and profits for the company by more than 1000 percent over the past 3 years. As a result of his solid managed care relationships, coupled with Mr. Wedekind's recognized leadership expertise in government-run and third party HMO's, IntegraNet has grown very rapidly. With the rise of IntegraNet, he and his outstanding staff literally know, contract with, or visit almost every primary care

20

physician and independent practice organization (IPA) in Harris County and the surrounding 5 counties.

2007-2009     - Mr. Wedekind, along with Ed Horn, formed and developed **Electronic Medical Resources, LLC** (EMR) in order to assist IntegraNet, other IPA's around the country, and their physicians in the implementation of affordable and relevant electronic health records within their physician offices. EMR employs a unique service and delivery model that has been embraced by Allscripts and other leading electronic health record companies as the Delivery Model of the future in the US.

## B. Nature of the Debtor's Business

The Debtor filed his original personal property (Schedule "B") schedules and listed the assets described below in that Schedule:

### "SCHEDULE B"

| Type of property | Description & Location | Current Market Value |
|---|---|---|
| Cash * | Wells Fargo Bank | $100.00 |
| Checking & savings accounts * | Wells Fargo Bank & Houston Federal Credit Union | $16,785.00 |
| Real Property * | None | None |
| Personal Property ** | (At Debtor's Home) | $145,385.00 |
| **Total Property** | | **$162,270.00** |

\*  **Property secured to the lien of the Internal Revenue Service**
\*\* **Property partially secured to the Internal Revenue Service**

### C.    Source of Information Stated Herein

The source of all information stated herein is Lawrence J. Wedekind, the Debtor. Mr. Wedekind, in consultation with his attorney and accountant, has assisted in preparing the financial projections used herein, as well as the projected value of the Debtor's property based upon his knowledge and experience.  In addition, he has used his background and experience which was gained from over 20 years of medical management business to arrive at the estimates of value and numerical data used herein, especially regarding the projections and liquidation analysis.

### D.  Evaluation and Description of Significant Assets

The key value of Mr. Wedekind's business is derived from the services provided to his employer and its clients.  Mr. Wedekind has enabled his employer to develop a physician network of more than 1200 active physicians.  The Debtor's significant asset is his ability to manage the medical service network which he has created and developed into what it is today.  The Debtor does not have any ownership interest in his employer, IntegraNet, and is dependent on its continued growth, profitability and existence to continue to earn a substantial amount of compensation with which he can fund his Plan of Reorganization. The Debtor is confident that, should anything happen to IntegraNet,  he would be able to affiliate himself with another medical management organization at the same or greater level of compensation he is currently receiving. His skills have been proven for over 20 years and he believes that the majority, if not all, of his employer's clients or contacts would reasonably be expected to follow him to another office. As is true with virtually every manager of an organization the size of IntegraNet, the only professional assets of real value the Debtor has are his training, skills, expertise and reputation.

### E. Pre-Petition Operations and
### Events Leading to the Filing of Bankruptcy

Prior to the filing of the Debtor's Bankruptcy Proceeding he had been operating the Dickerson Memorial Hospital ("Dickerson") in Jasper, Texas since 2000 as an executive officer. Dickerson, over a number of years had not received payments from Medicare and other agencies which caused it to experience financial losses. Many of these losses were funded by loans from IntegraNet and related companies. Dickerson, when it did not operate profitably, began to incur deficiencies in the payment of federal employment taxes which it never had the funds to pay due to unpaid receivables from the federal government, among others. Dickerson attempted a Chapter 11 reorganization in 2008 which was dismissed and a Chapter 7 Liquidation in 2009 which was also dismissed. Dickerson is now poised to file a state court receivership in order to be liquidated and terminate its existence. The Debtor's chief liabilities are to the IRS for employment taxes which Dickerson did not, and could not pay. After counsel for the Debtor and his accountant analyzed the claims of the Debtor's creditors, the Debtor's financial affairs and preliminary estimates of the Debtor's general unsecured liabilities, it became apparent that the Debtor would be unable to pay his debts without a formal reorganization of his financial affairs. The Debtor can reorganize by paying a Twelve Percent Dividend (12%) and by continuing to work in his existing occupation.

### F. Changes in the Debtor's Operations,
### Present Condition of the Debtor and Chapter 11 Operations

The Debtor, Lawrence J. Wedekind, continues to work as an employee and executive of IntegraNet in the same manner as he did immediately pre-petition. His income is expected to increase based upon the increase in services and clients of IntegraNet. The Debtor has also been compelled by the Bankruptcy Court to make payments of approximately $5,000.00 per month into a

special "Trust Account" maintained at OmniBank. Currently there is approximately $30,000.00 in that account which the Debtor plans to use for Plan payment and possibly to pay the IRS Secured Claim.

## G.  Anticipated Future of the Debtor

The Debtor anticipates that he will remain active in his medical management business and earn sufficient income to make all of the payments specified in the Original Plan.  The Debtor's expectations are based on the considerable improvement of his practice methods and the continued growth of the IntegraNet organization.

The ability of the Debtor to make the payments provided for under the Original Plan is based upon the Debtor's continued ability to remain in business and serve the needs of the specialized clients of IntegraNet.  The Debtor also anticipates that he will remain profitable in the future as IntegraNet expands the type of services offered to its clients.

## H. Affiliates

The applicable provision of § 101(2) of the Code defines "Affiliate" to mean:

(B)     corporation 20 percent or more of whose outstanding voting securities are directly or indirectly owned, controlled, or held with power to vote, by the debtor, or by an entity that directly or indirectly owns, controls, or holds with power to vote, 20 percent or more of the outstanding voting securities of the debtor, other than an entity that holds such securities:

(i)     in a fiduciary or agency capacity without sole discretionary power to vote such securities; or

(ii)     solely to secure a debt, if such entity has not in fact exercised such power to vote.

Within the statutory definition set forth above, the Debtor has no existing affiliates.

## I. <u>Transfers</u>

Sections 547 and 548 of the Code prohibit certain payments and transfers of property during varying periods and prior to the commencement of a bankruptcy case.  Section 547 deals with preferences and § 548 deals with fraudulent transfers.

Generally, a "preference" is a payment made by an insolvent debtor to a creditor, or for the benefit of a creditor, within ninety days of the date of filing of a case, (the "reach back period") under any chapter of the Bankruptcy Code as a result of which the creditor receives more than it would if the debtor had filed the case as a liquidating bankruptcy under Chapter 7 of the Code. Under § 547 of the Code, a debtor is presumed to be insolvent during the ninety days preceding the filing of the case.  A "reach back period" of one year is applicable to payments made to insiders of the debtor.  An insider of an individual debtor, such as Lawrence J. Wedekind, includes, but is not limited to, relatives, partners and corporations controlled by the Debtor. Excluded from the types of payments which are prohibited transactions under § 547 are those payments made to creditors in a bankruptcy case for the purpose of placing the debtor's assets beyond the reach of creditors.  Also, transfers for no, or for grossly disproportionate consideration, made while the debtor is insolvent, or as a result of which the debtor becomes insolvent, are fraudulent transfers.

Under § 101(50) of the Code, a "transfer" is defined to mean:

[E]very mode, direct or indirect, absolute or conditional, voluntary or involuntary, or disposing of or parting with property or with an interest in property, including retention of title as a security interest and foreclosure of the debtor's equity of redemption.

Both preferences and fraudulent transfers are prohibited transactions and may be set aside. In the event such prohibited transactions are set aside, the person or entity to which the prohibited transfer or payment was made must return to the Debtor or to the Debtor's estate, the money or

property received.  Failure to return such money or property may result in the payee or transferee's claim against the Debtor being disallowed and appropriate orders or writs being issued for the seizure of the property or the recovery of the money.

The Debtor has examined the significant transactions made in the year preceding the filing of this case for the purpose of determining whether any of such transactions constitute preferences or fraudulent transfers. Of the transactions examined, the Debtor has identified at no transfers made to any creditors as having the characteristics of preferences or fraudulent transfers.

## J. Pending Litigation Concerning the Debtor

The Debtor is currently not involved in any active litigation.  The Debtor, operating under the belief that the claims assigned to him from Dickerson Memorial Hospital, Ltd. were assignable had filed two Adversary Proceedings against agencies of the United States Government seeking a recovery – by way of turnover, of funds that were owed to Dickerson.

On June 30, 2009 Adversary Proceeding No. 09-03246 was filed in this Court by the Debtor against the United States Federal Emergency Management Agency ("FEMA") to recover approximately $209,254.35 which was claimed due by Dickerson for costs and expenses of keeping Dickerson open during Hurricane Rita in 2005.

Also on June 30, 2009, Adversary Proceeding No. 09-03247 was filed in this Court by the Debtor against The United States Department of Health and Human Services to recover certain transitional corridor payments for years 2001 through and including 2005 in the aggregate amount of $1,159,326.00.

Both of these Adversary Proceedings were dismissed on September 30, 2009 after the Debtor's counsel had discussed these claims at length with an attorney from the United States Department of Justice who had provided ample statutory and case authority which demonstrated

that the Debtor did not have the requisite standing to pursue these claims.  As a result, they are solely the right and property of Dickerson and must be pursued by it in the appropriate forum. The Debtor has amended his bankruptcy schedules on this date to reflect the fact that these claims are no longer to be considered as his personal assets.

### K. Prospective & Future Litigation

The Debtor will file an Objection to the Secured Claim of the Internal Revenue Service as he does not have the amount of assets which the IRS claims as subject to its tax lien based upon his amended bankruptcy schedule "B," as well as certain other creditors to be determined.

### IV.

### CLAIMS OF CREDITORS

### A.  Administrative Claims

#### (Class 1 Claims)

As set forth in the Original Plan, the Class 1 claims consist of those determined to be expenses of administration under § 503(b) of the Code.  Under § 503 of the Code, any person or entity may seek the allowance of a claim as an administrative expense.  Because administrative expenses enjoy a priority of payment, as required by  §1129 (a) (9) (A) of the Code and must be paid in cash and in full on the Effective Date of any Chapter 11 Original Plan, the types of claims which may be treated as administrative expenses are somewhat limited.  Among the types of expenses which are entitled to be treated as administrative expenses under § 503 of the Code are those for professional fees of a debtor's attorney as well as the "use" fees to the United States Trustees based upon actual disbursements while this Case is open.

The Debtor's attorney and accountant both filed an application with the Court on April 21 2009 in which they sought permission to be retained by the Debtor, in their professional capacity.

To date, the first interim fee application has not been filed by either of said professionals. The Debtor's professional advisors anticipate only filing a final fee application after the Debtor's Plan of Reorganization is confirmed by the Court.

The quarterly disbursement fees to the office of the United States Trustee are believed to be current as of this date. The Debtor's disbursements have generally been in the minimum range level per quarter, thus requiring payments of $500.00 per quarter based upon the Trustee's mandatory payment schedule. The fee to the United States Trustee's Office is based upon actual disbursements. These fees will no longer be due after the Original Plan is confirmed and this **Case is officially closed by the Court**.

The reorganized Debtor will be responsible for timely payment of the United States Trustee quarterly fees incurred pursuant to 28 U.S.C. 1930(a)(6). Any fees due as of the date of confirmation of the Original Plan will be paid in full in the effective date of the Original Plan. After confirmation, the reorganized Debtor will pay the United States Trustee quarterly fees as they accrue until this case is actually closed by the Court. The Debtor will file with the Court and serve on the United States Trustee a quarterly financial report for each quarter (or portion thereof) that the case remains open in a format prescribed by the United State Trustee.

An estimate of the <u>total amount</u> of professional fees incurred in connection with this case, including the actual and necessary expenses incurred by the Debtor's attorney and accountant on behalf of the Debtor to obtain confirmation, is approximately $30,000.00 and $15,000.00 respectively.  Administrative expenses to the United States Trustee should be not more than $2,000.00 for any final quarter in which the Original Plan is confirmed although the final payment of such is estimated to be not more than an aggregate of $2,000.00. The total Administrative Claims of the Chapter 11 Debtor's attorney and accountant, and any current or arrearage payment to the

Office of the United States Trustee prior to deducting retainers, are not anticipated to exceed $50,000.00, and are summarized as follows:

| Class | Claimant | Amount | Claim Status |
|-------|----------|--------|--------------|
| 1 | United States Trustee | $ 2,000.00 | Based on amounts disbursed |
| 1 | James R. Clark | $30,000.00  (a) | Subject to fee application |
| 1 | Michael P. Jayson, CPA | $15,000.00  (a) | Subject to fee application |
| | **Subtotal Class 1 claims** | **$47,000.00** | |

## B. Secured Creditors

### (Class 2 Claims)

**Class 2 Secured Creditors Claims:** Holders of these allowed claims, being secured, will also be paid in cash and in full for any post-petition arrearage on the Effective Date of the Original Plan.  These Creditors hold first or purchase money liens on real and personal property held or used by the Debtor. Accordingly, they are not considered impaired, although the extent and value of their liens may be contested. In addition, the Internal Revenue Service, in its latest alleged secured claim has claimed a secured value of that debt against the Debtor's property which exceeds the equity he has in such property.  That claim, as well as those of the taxing authorities, will be objected to before the date set for the confirmation hearing to be set in this Case.

b.      The Debtor will continue to timely file his federal income tax returns and will pay any actual post petition amounts determined on a current basis. Any allowed ad valorem tax claims are not impaired under the Original Plan since, if any amount is owed thereon, such will be satisfied in full, if and to the extent allowed, via equal monthly payments over 120 months with interest at Three Percent (3%) simple interest per annum from the Effective Date of the Plan. The IRS and possibly OmniBank hold liens on personal property held or used by the Debtor. The Debtor does not own any real property.  Accordingly, the IRS and a portion of the OmniBank claim is not

29

considered impaired, although the extent and value of their liens may be contested.

       c.     The secured claim of the Internal Revenue Service will be satisfied from the Debtor's future income and will make equal monthly payments to the IRS, with interest at Three Percent (3%) per annum until fully paid within a period of 120 months from the Effective Date. The Debtor expects that Dickerson will recover at least $1,368,000.00 on its claims against the federal government and that recovery will be used to pay down the IRS which will, in turn, reduce the amount which the Debtor will have to pay.

      The filed secured claim is summarized below:

**Secured Claims**

| 2 | Internal Revenue Service | $2,264,769.46 | Objection to be filed |
|---|---|---|---|
| | **Subtotal class 2 claims** | **$2,264,769.46** | |

## C. Priority Claims

### (Class 3 Claims)

      The only holder of this claim, being the Internal Revenue Service is a priority, and will also be paid in cash and in full for the amount of its claim, once determined, over a period of 60 months following the Petition Date when this Case was filed. This Creditor does not hold any lien on property held or used by the Debtor for this portion of its Claim. Accordingly, it is not considered impaired. The priority claim of the Internal Revenue Service will not be objected to. The Internal Revenue Service priority claim will be paid in 60 equal monthly installments, with interest at the rate of Three Percent (3%) simple interest commencing on May 1, 2010 but in sufficient amounts to pay this entire claim within sixty (60) days following the Petition Date of March 31, 2009. This Claim is not considered impaired as it is being paid in full, with interest, pursuant to the Bankruptcy Code.

**Priority Claims**

| | | | |
|---|---|---|---|
| 3 | Internal Revenue Service | $34,056.03 | Allowed as filed |
| | **Subtotal class 3 claims** | **$34,056.03** | |

## ARTICLE IV

### Treatment of Claims Impaired Under the Original Plan

Claims in Classes 4 & 5 are impaired under the Original Plan within the meaning of § 1124 of the Code.

4.01   **Impaired Unsecured Claims.**  The holders of claims in Classes 4 & 5 are impaired under the Original Plan within the meaning of § 1124 of the Code.

a.   **Class 4 Unsecured Administrative Convenience Claims.** The Debtor for administrative convenience has, arbitrarily, placed all general unsecured creditors holding claims valued or stated as $10,000.00 or less, in this Class. Each such creditor will receive the lesser of $2,000.000 or the actual amount of their claim, in a lump sum, in cash, without interest within 60 days of the Effective Date of the Plan. Thereafter, they will receive no other payments from the Debtor.  The creditors listed in this Class will have the option to elect out of Class 4 and into Class 5 if they prefer to receive the Twelve Percent (12%) dividend on their claim, without interest, over the extended payment period instead of the amount and period provided in Class 5. Once that election is made on the form of Ballot used for voting on the Debtor's Plan of Reorganization, it will be irrevocable. These claims are summarized as follows:

| | **Unsecured          Administrative Convenience Class** | | |
|---|---|---|---|
| 4 | American Express Centurion Bank | $8,848.11 | Allowed as filed |
| 4 | American Express Travel Related Services Co., Inc. | $1,824.84 | Allowed as filed |
| 4 | American Express Travel Related Services Co., Inc. | $380.64 | Allowed as filed |

31

| 4 | Omnibank, USA | $940.05 | Allowed as filed |
| | **Subtotal class 4 claims** | **$11,93.64** | |

       b.    **Class 5 Impaired General Unsecured Claims.**    The holders of claims in Class 5 are <u>impaired</u> under the Original Plan within the meaning of § 1124 of the Code.

       c.    The Class 5 Claims comprise all of the general unsecured claims presently known to exist against the Debtor.  These claims, identified by the name of the Claimant and the amount of such claim elsewhere hereinabove, and below, will be paid a Dividend on their allowed claims of Twelve Percent (12%).  The payment to be made to all of these claimants will be in the form of 120 equal monthly installments without interest, which will commence on May 1, 2010. Such payment will not include any interest. Accordingly, these claimants will not receive anything further from the Debtor after the payment of the foregoing Dividend has been made in full. A creditor in this Class may elect to join Class 4 and receive the treatment accorded to that Class upon making the election contained on the ballot.  These claims are summarized as follows:

**Unsecured General Claims**

| 5 | David Mosig | $33,333.35 | Possible Objection |
| 5 | John Tatum | $355,211.11 | Allowed as filed |
| 5 | Omnibank, USA | $1,316,162.45 | Possible Objection |
| 5 | Omnibank, USA | $577,785.95 | Possible Objection |
| | **Subtotal class 5 claims** | **$2,282,492.86** | |

**ARTICLE V**

**Execution and Implementation of the Original Plan**

**FINANCIAL MATTERS**

**A.  Financial Statement and Accounting Method**

Attached to this Disclosure Statement is a copy of Debtor's latest Monthly Operating Report, as of July, 2009; being the reporting period on file nearest the date of this Disclosure Statement.  That document is attached hereto as Exhibit "B" which provides a picture of Debtor's operations at present. The Debtor uses the cash method of accounting for both tax and financial reporting purposes.

**B.  Cash Receipts, Projections and Assumptions.**

While no certainty exists that the Debtor will have cash receipts equal to or greater than those projected on the projections of income and expense attached to this Disclosure Statement as Exhibit "C", the Debtor believes that such income is likely to be obtainable.  Many factors determine the ability of the Debtor to generate cash and, therefore, the funds necessary to pay the claims of creditors in accordance with the Original Plan.  Nonetheless, the Debtor believes that the projections, and the assumptions upon which they are based, provide a reliable forecast of the funds which creditors may anticipate being received by the Debtor during the life of the Original Plan, in order to fund the Original Plan.  The Debtor, Mr. Wedekind, has prepared those financial projections in concert with his accountant and is responsible for their accuracy.  These projections are only estimates and are believed to be reasonable in light of the fluctuating furniture market and the intense competition therein.

### C. **New Equity**

The Debtor will commit all of his disposable future income in order to insure that all Original Plan Payments are made. The Debtor anticipates adequate profits over the term of the Original Plan to pay all creditors in full the amount of the Twelve Percent (12%) Dividend.  In addition, the Debtor may fund payments from his other personal assets and resources should such be necessary to insure all payments are made.  In addition, should the Debtor acquire any assets from his family or others in the future, he may (but is not required to) devote some or all of the value of such to satisfy the payments required to be made under the Original Plan.

### VI.

### OWNERSHIP AND FUTURE MANAGEMENT OF DEBTOR

### A.  **Ownership**

On the Effective Date of the Original Plan, the ownership of all of the Debtor's assets will be vested in the Debtor, subject only to the claims of the specific secured creditors, the IRS, as well as the payments required by the Debtor under the Original Plan.  He will retain his exempt property as permitted by applicable laws.

### B. **Management**

Lawrence J. Wedekind, Debtor, will continue to manage his business affairs as the Debtor, and will receive from his employer's medical management business the funds necessary to pay the Debtor's operating expenses and the Original Plan payments scheduled hereunder.  The Debtor's accountant will also continue to work with him in the future to maximize revenues, control costs and supervise and disburse Original Plan payments.

34

## VII.

## RISKS TO CREDITORS, FAILURE TO CONFIRM THE ORIGINAL PLAN AND LIQUIDATION ANALYSIS

Confirmation of the Original Plan presents risks to creditors.  The Debtor has attempted to disclose all significant risks which the Original Plan presents to the holders of claims and the likely result if the Original Plan is not confirmed.  The description of the risks to creditors is intended to be complete; however, unforeseen events may present risks to creditors not presently within the contemplation of the Debtor, and creditors are urged to consider all risks carefully.

### A.  Risks to Creditors

The Debtor's income is entirely dependent upon his future employment for income.  Should such decrease; a significant impairment of the Debtor's ability to operate economically could result.  A corresponding result from such occurrence would be an inability on the part of the Debtor to satisfy the claims of creditors pursuant to the Original Plan.  As a result, the Debtor is attempting to commence making payments to creditors quickly in order to be certain that the Twelve Percent Dividend (12%) will be fully paid.  He may also sell his exempt and non-exempt property to insure that all Plan payments are made, however, there can be no certainty as to how much in the way of funds may be generated by such sale or sales.

### B.  Failure to Confirm Original Plan

Failure to confirm the Original Plan or any amendment thereto will undoubtedly result in the conversion of this case to one under Chapter 7 of the Code.  In a case under Chapter 7 of the Code, an interim Trustee is appointed by the Court, or elected by the creditors, to liquidate all of the non-exempt property of a Debtor's estate.  After liquidation of the Debtor's non-exempt property, the creditors are paid in the order provided by law.  Under the law, administrative claims and statutory

35

priorities are paid first, and unsecured creditors and tax penalties are paid last.  Conversion to Chapter 7 would not be dictated in this case, since the Debtor has a realistic alternative to liquidation - if the creditors accept the Original Plan.

### C.  Liquidation Analysis

An analysis of the anticipated distribution which creditors of the Debtor would receive if this case is converted to one under Chapter 7 of the Code, assuming distress sale (and not "Fair Market") values of the Debtor's tangible, non-exempt assets, based on estimates of value provided by Mr. Wedekind, are as follows:

| Property | Sale Value | Sales Expense | Net Value |
|---|---|---|---|
| Cash | 100 | None | 100 |
| Special Trust Fund | 30,000 | None | 30,000 |
| Personal Property | 162,270 | None | 162,270 |
| Real Property | None | None | None |
| **Totals** | **$192,270** | **$0** | **$192,270** |

| Claim | Amount |
|---|---|
| Chapter 7 Trustee Fees and Costs | 4,868 |
| Chapter 7 Attorney, Accountant and Appraiser | 10,000 |
| IRS – Secured & Priority Taxes | 177,402 |
| Chapter 11 Professional Fees | 0 |
| **Total outlays prior to unsecured creditors** | **0** |
| **Payment to unsecured creditors** | **0** |

**\* Subject to the possible claim of OmniBank against certain life insurance policies.**

It is apparent that the Original Plan provides a <u>greater</u> distribution to <u>unsecured creditors</u> than would otherwise be received by them had this case been commenced, or if it is converted to one under Chapter 7 of the Code.  It also provides a <u>certainty</u> of repayment to the extent of the dividend treatment provided in the Original Plan.  In a Chapter 7 case, any distribution by the Trustee after payment of the Trustee's fee, would be made to the taxing authorities, the holders of priority claims, in full satisfaction of the amount due from the Debtor, then to the perfected secured lien claimants, if any and, next, to tax claims.  Thereafter, if any funds remain, the other secured and unsecured creditors would then be paid.  Under the Chapter 11 Original Plan, not only will the secured and priority creditors be paid in full (once those amounts are actually determined), the unsecured creditors of the Debtor will receive a distribution on account of their claims, without interest, the amount of which is equal to Twelve Percent (12%).  Such would not occur if the Debtor's property were sold for less than the estimated values stated above and his future income was not contributed to the Original Plan.

The difference between the distribution which creditors would receive in a Chapter 7 case and the distribution which creditors would receive under the Original Plan results largely from the Debtor's future income.  Unlike a Chapter 7 case, under the Original Plan, the Debtor must and will contribute future income from his business or employment to satisfy claims of creditors. To the extent of any distribution to creditors from such future income, creditors will receive as much as, if not actually more than, they would if this case had been commenced or is converted to one under Chapter 7 of the Code, since the Debtor cannot normally be <u>required</u> to use future income.

## VII.

## <u>FEDERAL TAX CONSEQUENCES OF THE ORIGINAL PLAN</u>

There appears to be no substantial tax consequence to the Debtor resulting from confirmation of the Original Plan.  Due to the numerous changes in tax legislation, it is not practical to present a detailed explanation of the federal income tax aspects of this Original Plan.  For this reason, and because the federal income tax consequences of the Original Plan may be different for different participants, each prospective participant/creditor is urged to seek the advice from such person's or entity's own counsel with respect to the federal income tax consequences of the Original Plan. There should be no adverse tax consequences to the reorganized Debtor, since he will be able to adjust his tax attributes based upon discharge of the unpaid accrued liabilities.  The following discussion, however, should be considered as a <u>general summary</u> of <u>possible</u> tax consequences of acceptance and operation under the Original Plan.

This tax analysis of the Original Plan to creditors of the estate is necessarily general in nature, and is not directed to the specific tax situation of any specific person or entity with an interest in the Debtor's estate.  <u>Creditors and other interested persons are advised to consult their own tax advisors with regard to the federal and any state income tax consequences of acceptance of the Original Plan in their own specific situation</u>.

Treatment of creditors whose claims will be satisfied at less than their full scheduled amount will depend upon each such creditor's method of accounting for bad debts, and upon whether and to what extent such creditor has taken into account its claim against the Debtor in reporting its bad debt deduction in prior taxable periods, i.e., whether by direct charge-off or on the reserve method.

The mere receipt of payment from this estate by a creditor may not result in the recognition of gain or loss by the creditor due to the initial uncertainty of the value of the interest the creditor

may have in the estate.  However, if the value of the estate and the interest of the creditor can be determined with reasonable certainty then gain or loss may be recognized by the creditor upon the receipt of its designated interest in the estate.

For tax years beginning after 1986, the tax law eliminated the bad debt reserve method of deducting bad debts for taxpayers other than financial institutions.  Taxpayers need not charge off wholly worthless debts on their books to deduct them.

The Committee Reports on the Tax Reform Act of 1986 ("TRA") note that a delay in the charge-off of a debt on the books is not intended to shift the deduction from the year when it is clear that the taxpayer actually became aware that the debt was wholly worthless.

The direct charge-off method varies from generally accepted financial accounting principles, so companies that used the reserve method for both financial accounting and tax purposes and that must now change methods for tax purposes must set up a deferred tax account where none was required previously.

The change from the reserve method to the specific charge-off method is a change in accounting method initiated by the taxpayer with IRS consent.  To prevent duplication of deductions, the balance in any reserve account on the effective date must be taken into income ratably over four years.  For guaranteed bad debt reserves, the reserve balance is first reduced by the suspense account balance.  The remaining balance is taken into income ratably over four years. (Internal Revenue Code ("IRC") Sec. 481 adjustment.)

The foregoing reflects TRA Sec. 805, relating to bad debt reserves, which repealed IRS Sec. 166(c) and redesignated subsection (g) as subsection (f), effective for tax years beginning December 31, 1986.

By way of general summary, if a creditor has previously written off as a deduction or loss the amount which Debtor owed such creditor, the creditor must then claim as income the amount of repayment from Debtor in the year and to the extent actually received.  Any interest on the principal amount received by a creditor from the Debtor will also be taxable as interest income in the year actually paid and received.

DATED:  November 25, 2009                 <u>Debtor:</u>

                                          LAWRENCE J. WEDEKIND


                                          By: <u>/s/ Lawrence J. Wedekind      </u>
                                             LAWRENCE J. WEDEKIND


                                          **JAMES R. CLARK & ASSOCIATES**, **P.C.**


                                          <u>/s/ James R. Clark          </u>
                                          James R. Clark
                                          SBN: 04286000
                                          4545 Mt. Vernon
                                          Houston, TX  77006
                                          (713) 532-1300
                                          (713) 532-5505 (Fax)

                                          **ATTORNEY IN CHARGE FOR DEBTOR,
                                          LAWRENCE J. WEDEKIND**