IN THE UNITED STATES BANKRUPTCY COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION

| | | |
|---|---|---|
| IN RE: | § | |
| | § | CHAPTER 11 |
| LAWRENCE J. WEDEKIND, | § | |
| DEBTOR. | § | Case No. 09-32057-H4-11 |
| | § | |
| | § | |

**FIRST AMENDED DISCLOSURE STATEMENT IN SUPPORT OF
FIRST AMENDED PLAN OF REORGANIZATION PROPOSED
<u>BY LAWRENCE J. WEDEKIND</u>**

Leonard H. Simon, Esq.
TBA: 18387400; SDOT: 8200
PENDERGRAFT & SIMON, L.L.P.
The Riviana Building
2777 Allen Parkway, Suite 800
Houston, Texas 77019
(713) 528-8555 (Telephone)
(713) 253-2810 (Mobile)
(832) 202-2810 (Telecopy)
Email:  lsimon@pendergraftsimon.com

**PROPOSED ATTORNEY IN CHARGE FOR
LAWRENCE J. WEDEKIND**

**THIS FIRST AMENDED DISCLOSURE STATEMENT HAS NOT
YET BEEN APPROVED BY ORDER OF THE COURT**

This First Amended Disclosure Statement and the documents accompanying it contain a number of defined terms, which are denoted with capital letters.  Please refer to Article I of the First Amended Plan (defined below) for a complete listing and definitions of the capitalized terms used herein.

## <u>INTRODUCTION</u>

On March 31, 2009, LAWRENCE J. WEDEKIND, ("Debtor"), commenced this case by filing a voluntary petition for relief under Chapter 11, Title 11 of the United States Code (the "Bankruptcy Code" or "Code"). On January 18, 2010, the Debtor filed his Amended Plan of Reorganization (the "Plan") with his Amended Disclosure Statement pursuant to Rule 3016(c) of the Federal Rules of Bankruptcy Procedure (hereafter referred to as the "Disclosure Statement").

Under the provisions of 11 U.S.C. §1125, a court-approved Disclosure Statement is required to be provided by a Plan's proponent in connection with, and prior to, the solicitation of acceptances or rejections of a Plan of Reorganization.

This First Amended Disclosure Statement (the "Disclosure Statement") describes the *First Amended Plan of Reorganization for the Debtor* (the "Amended Plan"), which was filed on January 18, 2010, in the Debtor's Chapter 11 Case currently pending in the United States Bankruptcy Court for the Southern District of Texas, Houston Division. A true and correct copy of the Amended Plan is attached hereto and incorporated herein by reference for all purposes as **Exhibit "1"**.

**If you have a Claim against the Debtor, you should read this Disclosure Statement and the Amended Plan carefully. The Debtor urges all holders of Claims in Impaired Classes receiving Ballots to accept the Amended Plan.**

This Disclosure Statement, the Amended Plan, any amendments, supplements, and exhibits thereto, the accompanying Ballot form, if any, and the related materials delivered together herewith are being furnished by the Debtor to holders of Impaired Claims and Impaired Interests pursuant to § 1125, in connection with the solicitation by the Debtor of votes to accept or reject the Amended Plan (and the transactions contemplated thereby), as described herein.

This Disclosure Statement is designed to provide adequate information to enable holders of Claims against and Interests in the Debtor to make an informed decision whether to vote in favor of or against the Amended Plan that the Debtor is proposing. All Creditors are encouraged to read this Disclosure Statement and the Amended Plan in their entirety before voting to accept or reject the Amended Plan. The statements made in this Disclosure Statement are qualified in their entirety by reference to the Amended Plan, the exhibits annexed hereto and other documents referenced as filed with the Bankruptcy Court. Furthermore, the projected financial information contained herein has not been the subject of an audit.

All holders of Impaired Claims should read and consider carefully the matters described in the Amended Plan and Disclosure Statement as a whole, including Article VI, entitled "RISK FACTORS," prior to voting on the Amended Plan. In making a decision to accept or reject the Amended Plan, each Creditor must rely on its own examination of the Debtor as described in this Disclosure Statement and the terms of the Amended Plan, including the merits and risks involved. You are encouraged to seek the advice of qualified legal counsel with respect to the legal effect of any aspect of the Amended Plan or Disclosure Statement. In addition, Confirmation and consummation of the Amended Plan are subject to conditions precedent that could lead to delays in consummation of the Amended Plan. There can be no assurance that each of these conditions precedent will be satisfied or waived (as provided in the Amended Plan) or that the Amended Plan will be consummated as to the Debtor. Even after the Effective Date, distributions under the Amended Plan may be subject to substantial delays for holders of Claims that are Disputed.

With the exception of historical information, some matters discussed herein, including the projections and valuation analysis described herein are "forward looking statements" within

the meaning of the Private Securities Litigation Reform Act of 1995.  Such forward looking statements are subject to risks, uncertainties and other factors which could cause actual results to differ materially from future results expressed or implied by such forward looking statements.

No party is authorized by the Debtor to give any information or make any representations with respect to the Amended Plan or the Reorganization other than that which is contained in this Disclosure Statement.  No representation or information concerning the Debtor, its future business operations or the value of their properties has been authorized by the Debtor, other than as set forth herein.  Any information or representation given to obtain your acceptance or rejection of the Amended Plan that is different from or inconsistent with the information or representations contained herein and in the Amended Plan should not be relied upon by any holders of Claims or Interests in voting on the Amended Plan.

This Disclosure Statement has been prepared in accordance with § 1125 and not in accordance with federal or state securities laws or other applicable non-bankruptcy law.  Entities holding or trading in or otherwise purchasing, selling or transferring Claims against, Interests in or securities of, the Debtor should evaluate this Disclosure Statement only in light of the purpose for which it was prepared.

This Disclosure Statement has not been approved or disapproved by the Securities and Exchange Commission (the "Commission") or by any state securities commission or similar public, governmental or regulatory authority, and neither such Commission nor any such authority has passed upon the accuracy or adequacy of the statements contained herein.

With respect to contested matters, adversary proceedings and other pending or threatened actions (whether or not pending), this Disclosure Statement and the information contained herein shall not be construed as an admission or stipulation by any Entity, but rather as statements made in settlement negotiations governed by Rule 408 of the Federal Rules of Evidence and any other rule or statute of similar import.

This Disclosure Statement shall neither be admissible in any other proceeding involving the Debtor or any other party nor be construed to be providing any legal, business, financial or tax advice.  Each holder of a Claim or Interest should, therefore, consult with its own legal, business, financial and tax advisors as to any such matters concerning the solicitation, the Amended Plan or the transactions contemplated thereby.

The terms of the Amended Plan shall govern in the event of any inconsistency between the Amended Plan and the summaries thereof contained in this Disclosure Statement.

**Defined terms not defined in this Disclosure Statement shall have the meanings assigned to them in the Amended Plan.**

## INCORPORATION OF DOCUMENTS BY REFERENCE

This Disclosure Statement incorporates by reference certain documents relating to the Debtor that are not presented herein or delivered herewith.  The following documents are incorporated by reference herein in their entirety:

Debtor's Schedules and Statement of Affairs filed on April 30, 2009, together with *Amended Schedule B*, filed November 25, 2009, including all amendments and restatements thereto filed through the date of the approval of this Disclosure Statement.

Debtor's *Statement of Financial Affairs*, filed April 30, 2009, including all amendments and restatements thereto filed through the date of the approval of this Disclosure Statement.

Debtor's *Monthly Financial Reports*, including all amendments thereto filed through the date of the approval of this Disclosure Statement.

## AVAILABLE INFORMATION

Documents and pleadings filed in this cases are available at the following website: http://www.txsb.uscourts.gov/ .

## TABLE OF CONTENTS

**Page**

I.   INTRODUCTION AND SUMMARY ................................................................. 5
  A. The Solicitation. ........................................................................................ 5
  B. Recommendation. ....................................................................................... 6
  C. Sources of Information .............................................................................. 6
II.  BACKGROUND ............................................................................................... 6
  A. Curriculum Vitae For Lawrence J. Wedekind, The Debtor ............................. 6
  B. Events Leading to Chapter 11 Filing .......................................................... 9
  B. Changes in the Debtor's Operations, Present Condition of the Debtor and Chapter 11 Operations ........................................................................................................ 10
  C. Anticipated Future of the Debtor ............................................................. 10
III. THE CHAPTER 11 CASES ............................................................................ 10
  A. Chapter 11 Filing of the Debtor ............................................................... 10
  B. Significant Events During the Case .......................................................... 10
IV.  THE PLAN ...................................................................................................... 11
  A. General. .................................................................................................. 11
  B. Summary of Plan Classification and Treatment. ........................................ 11
  C. Means for Execution of the Amended Plan. ............................................... 15
  D. Executory Contracts and Unexpired Leases .............................................. 17
  E. Conditions Precedent to the Effective Date .............................................. 18
  F. Good Faith Solicitation Under § 1125. ..................................................... 19
  H. Effect of Confirmation of the Amended Plan. ........................................... 19
V.   THE PROJECTIONS ...................................................................................... 24
VI.  RISK FACTORS ............................................................................................. 24
  A. Business Risks. ....................................................................................... 24

B. Risk of Non-Confirmation of the Amended Plan.............................................................. 24
C. Nonoccurrence of Effective Date of the Amended Plan. ................................................. 24
VII.            CONFIRMATION OF THE PLAN.................................................................... 25
A. Voting Procedures and Requirements. ............................................................................ 25
B. Acceptance. ..................................................................................................................... 27
C. Confirmation of the Amended Plan.................................................................................. 27
D. The Best Interests Test. ................................................................................................... 27
E. Feasibility. ....................................................................................................................... 29
F. Non-Acceptance and Cramdown..................................................................................... 29
G. Confirmation Hearing...................................................................................................... 31
VIII.           ALTERNATIVES TO CONFIRMATION OF THE PLAN ............................... 31
A. Liquidation Under Chapter 7.......................................................................................... 31
B. Alternative Plan. .............................................................................................................. 31
IX. FEDERAL INCOME TAX CONSEQUENCES ...................................................................... 32
X. AVOIDANCE ACTIONS ....................................................................................................... 32
XI. DISCLOSURE STATEMENT DISCLAIMER.......................................................................... 34
A. The Debtor has No Duty to Update.................................................................................. 34
B. No Representations Outside the Disclosure Statement Are Authorized. ........................ 34
C. All Information Was Provided By Debtor and Was Relied Upon By Professionals. ..... 35
D. No Legal or Tax Advice Is Provided To You By This Disclosure Statement. ............... 35
E. No Admission Made.......................................................................................................... 35
F. No Regulatory Agency Approval...................................................................................... 35
XII.            CONCLUSION AND RECOMMENDATION.................................................... 35

# I.    INTRODUCTION AND SUMMARY

The following introduction and summary is qualified in its entirety by, and should be read in conjunction with, the more detailed information appearing elsewhere in this Disclosure Statement.

## A.    The Solicitation.

On November 25, 2009, the Debtor filed his Original Plan of Reorganization with the United States Bankruptcy Court for the Southern District of Texas, Houston Division.   On January 18, 2010, the Debtor filed his First Amended Plan of Reorganization (the "Amended Plan").   This Disclosure Statement is submitted by the Debtor to be used in connection with the solicitation of votes on the Amended Plan.

Debtor has requested that the Bankruptcy Court hold a hearing on approval of this Disclosure Statement to determine whether this Disclosure Statement contains "adequate information" in accordance with § 1125.   Pursuant to § 1125(a)(1), "adequate information" is defined as "information of a kind, and in sufficient detail, as far as reasonably practicable in light of the nature and history of the Debtor and the condition of the Debtor's books and records, . . . that would enable a hypothetical reasonable investor typical of holders of claims or interests of the relevant Class to make an informed judgment about the Amended Plan."   A hearing to consider the adequacy of this Disclosure Statement shall be held on _____, 2010,

at _____ O'Clock, _.m. Central Standard Time in Houston, Texas, in Courtroom 403, 515 Rusk Street, Houston, Texas 77002.

The Bankruptcy Court has scheduled a hearing to consider Confirmation of the Amended Plan before the Honorable Jeff Bohm, United States Bankruptcy Judge on _____, 2010, at _____ O'Clock, _.m. Central Standard Time in Houston, Texas, in Courtroom 600, 515 Rusk Street, Houston, Texas 77002.  The hearing may be adjourned from time to time without further notice other than by announcement in the Bankruptcy Court on the scheduled date of such hearing.  Any objections to Confirmation of the Amended Plan must be in writing and must be filed with the Clerk of the Bankruptcy Court and served on the counsel listed below to ensure receipt by them on or before _____, 2010, at _____ O'Clock _.m. Central Standard Time.  Bankruptcy Rule 3007 governs the form of any such objection.  Parties on whom objections must be served are:

> Counsel for the Debtor:
> Leonard H. Simon, Esq.
> PENDERGRAFT & SIMON, L.L.P.
> The Riviana Building
> 2777 Allen Parkway, Suite 800
> Houston, Texas 77019
> (713) 528-8555 (Telephone)
> (713) 253-2810 (Mobile)
> (832) 202-2810 (Telecopy)
> Email:  lsimon@pendergraftsimon.com

**B.      Recommendation.**

**THE DEBTOR URGES ALL CREDITORS TO VOTE TO ACCEPT THE PLAN**

The Debtor believes that (i) the Amended Plan provides the best possible result for the holders of Claims against and Interests in the Debtor; (ii) with respect to each Impaired Class of Claims or Interests, the distributions under the Amended Plan are greater than the amounts that would be received if the Debtor was to liquidate under Chapter 7; and (iii) acceptance of the Amended Plan is in the best interest of holders of Claims and Interests.

**C.      Sources of Information**

Except as otherwise expressly indicated, the information provided for in this Disclosure Statement has been prepared and furnished by the Debtor and its management.

**II.      BACKGROUND**

**A.      Curriculum Vitae For Lawrence J. Wedekind, The Debtor**

Mr. Wedekind was born and raised in Florida. He received his Bachelor of Science Degree from University of Florida in 1977.  He next received his Master Business Administration (M.B.A)

& Master of Health Administration (M.H.H.A.) from the University of Florida in 1979.

Mr. Wedekind moved to Houston and began to develop the business model he is now involved in. Mr. Wedekind, during more than 20 years of operating his own companies from (1986-2009) has been integrally involved in every facet of health care financing and delivery of healthcare within the Southeastern U.S. Market.

Mr. Wedekind's medical management business employer has mainly corporate clients. Numerous of his clients have relied upon his services for many years. His detailed information follows:

EDUCATION

Regulatory and continuing education in healthcare and healthcare technology- ONGOING
M.B.A. & M.H.H.A. - University of Florida, 1979
B.S. - University of Florida, 1977

BACKGROUND AND EXPERIENCE SUMMARY

During more than 20 years of operating his own companies (1986-2009), Larry Wedekind has been integrally involved in every facet of health care financing and the delivery of health care within the southeastern U.S. market. The various major projects that he has directed with their associated time frames are briefly described below.

1985-1986  - Mr. Wedekind led the development, construction, financing, and management of the Walter Reed Medical Building; a 46,000 sq. ft. medical mall in Garland, Texas. He achieved over 95% occupancy in this building within the first year, making this a very successful project.

- Led the development, financing, and operation of a physician-owned Cardiology Diagnostic Center in Garland, Texas. Twelve physician investors were brought into this investment opportunity. Their initial capital investment was returned to them from positive cash flow within 3 months of start-up operations. This was the first free Diagnostic Cardiology Center in Garland and was very successful.

- Led the development, financing, and operation of a physician-owned Imaging Center in Garland, Texas. Sixteen physician investors were brought into this investment into this investment opportunity and their initial investment was returned to them from positive cash flow within one (1) year. Again, a very successful center.

1987-1994  - He was the Contract Regional Director of six (6) hospitals in the Southeast for American Healthcare Management, Inc. ("AHM"). His primary responsibility was to form limited partnerships in each of these markets with the medical staff of each hospital in order to update equipment and facilities and more effectively

compete with other area hospitals. When AHM unexpectedly filed for bankruptcy protection in 1988 on the West Coast, he was able to lease purchase one of these six hospitals from AHM, and was also able to terminate the regional director contract – see below.

- Lease Purchase of Wylie Community Hospital (Wylie, Texas) from AHM. Mr. Wedekind formed a unique local physician and management owned company (L.P.) to lease purchase Wylie Community Hospital from AHM, (which was in Chapter 11 during the lease-purchase of the Wylie hospital). His corporation assumed the debt for the G.P. position, and many local physicians contributed cash equity in return for pro-rata limited partnership investments. His company also leased the facility and operated it as a Limited Partnership for 6 years, and he was CEO of the G.P. for this new entity for six (6) years. Since this hospital became very profitable under Larry's leadership, when the Landlord changed in 1993, the landlord company attempted to take back control of this hospital they had previously owned. After a protracted battle with the Landlord for control of the hospital, the hospital was sold to the Presbyterian Hospital                    System                    in                    1994.

- During this timeframe, Mr. Wedekind also developed two Sports Medicine Rehab Centers and a Wellness Center associated with each rehab center. He then formed a company with other investors to take over the operations of two 50,000 sqft. super-health clubs in the Dallas area that had suffered from poor management in the past, (these clubs were located next to his newly developed rehab/wellness centers).

1994-1995   - He successfully reorganized a Ft. Worth, Texas hospital that had filed for bankruptcy protection. The bankruptcy court requested that Mr. Wedekind re-organize the Chapter 11 hospital on behalf of its creditors and the debtor in possession, and the 12 physician owners agreed to support his turn-around efforts. After approximately 11 months of work, the hospital became profitable, and his re-organization plan was approved. Mr. Wedekind then received a 5-year management contract offer from the debtor in possession. However, he turned down the employment offer in order to continue performing hospital turn-arounds in Texas through one of his companies.

1995-1996   - Mr. Wedekind successfully turned around a 99-bed hospital in Houston, Texas for the owners (one of the Doctor's Hospitals). This hospital was only 4 days away from losing its hospital license and paying a $500,000 fine to the Texas Department of Health for quality of care infractions. This is the day he began the turn-around at the request of the Texas Hospital Association. The owners were also losing approximately $120,000 per month and were cashing in pension fund money to make payroll upon his arrival. After convincing the TDH that he could improve the quality of care through Board and Medical Staff intervention, the licensure revocation and fines were delayed. Within three months after starting, the licensure revocation and fines were eliminated. The

hospital became profitable again, and the owners were later able to sell the hospital operations to another group for a sizable profit and ongoing equity interest in the hospital.

1996-2008   - Mr. Wedekind formed and developed <u>IntegraNet Physician Resources, Inc.</u> (IntegraNet) in 1996, and signed a multiyear contract with Blue Cross/Blue Shield for the management of Medicaid managed care lives for their HMO Blue subsidiary. He then signed another multiyear contract with Community Health Choice in 1997, and with UTMB and Evercare HMO's in 1998 and 2000 respectively. He also signed a major multi-year, multi-product contract with United Healthcare in 2004. Recently, he added 3 very large shared-risk Medicare Advantage HMO contracts starting in 2005, that have increased revenues and profits for the company by more than 1000 percent over the past 3 years. As a result of his solid managed care relationships, coupled with Mr. Wedekind's recognized leadership expertise in government-run and third party HMO's, IntegraNet has grown very rapidly. With the rise of IntegraNet, he and his outstanding staff literally know, contract with, or visit almost every primary care physician and independent practice organization (IPA) in Harris County and the surrounding 5 counties.

2007-2009   - Mr. Wedekind, along with Ed Horn, formed and developed <u>Electronic Medical Resources, LLC</u> (EMR) in order to assist IntegraNet, other IPA's around the country, and their physicians in the implementation of affordable and relevant electronic health records within their physician offices. EMR employs a unique service and delivery model that has been embraced by Allscripts and other leading electronic health record companies as the Delivery Model of the future in the US.

**B.    Events Leading to Chapter 11 Filing.**

Prior to the filing of the Debtor's Bankruptcy Proceeding he had been operating the Dickerson Memorial Hospital ("Dickerson") in Jasper, Texas since 2000 as an executive officer. Over a number of years, Dickerson had not received payments from Medicare and other agencies which caused it to experience financial losses.  Many of these losses were funded by loans from IntegraNet and related companies and from Omnibank USA.  Dickerson, when it did not operate profitably, began to incur deficiencies in the payment of federal employment taxes which it never had the funds to pay due to unpaid receivables from the federal government, among others. Dickerson attempted a Chapter 11 reorganization in 2008 which was dismissed and a Chapter 7 Liquidation in 2009 which was also dismissed.  Dickerson is now poised to file a state court receivership in order to be liquidated and terminate its existence.  The Debtor's chief liabilities are to the IRS for employment taxes which Dickerson did not, and could not pay.  After counsel for the Debtor and his accountant analyzed the claims of the Debtor's creditors, the Debtor's financial affairs and preliminary estimates of the Debtor's general unsecured liabilities, it became apparent that the Debtor would be unable to pay his debts without a formal reorganization of his financial affairs.

**B.      Changes in the Debtor's Operations, Present Condition of the Debtor and Chapter 11 Operations**

The Debtor, Lawrence J. Wedekind, continues to work as an employee and executive of IntegraNet in the same manner as he did immediately pre-petition. His income is expected to increase based upon the increase in services and clients of IntegraNet. The Debtor has also been compelled by the Bankruptcy Court to make payments of approximately $5,000.00 per month into a special "Trust Account" maintained at OmniBank. Currently there is approximately $30,000.00 in that account which the Debtor plans to use for Plan payment and possibly to pay the IRS Secured Claim.

**C.      Anticipated Future of the Debtor**

The Debtor anticipates that he will remain active in his medical management business and earn sufficient income to make all of the payments specified in the Amended Plan.  The Debtor's expectations are based on the considerable improvement of his practice methods and the continued growth of the IntegraNet organization.

The ability of the Debtor to make the payments provided for under the Amended Plan is based upon the Debtor's continued ability to remain in business and serve the needs of the specialized clients of IntegraNet.  The Debtor also anticipates that he will remain profitable in the future as IntegraNet expands the type of services offered to its clients.


## III.      THE CHAPTER 11 CASES

**A.      Chapter 11 Filing of the Debtor**

On March 31, 2009, the Debtor filed the captioned chapter 11.

**B.      Significant Events During the Case.**


On May 1, 2009, the employment of James R. Clark was approved by the Court.

On May 1, 2009, the employment of Michael P Jayson, CPA was approved by the Court.

On May 18, 2009, the 341 meeting of creditors was held as was concluded.

The Debtor, operating under the assumption that the claims assigned to him from Dickerson Memorial Hospital, Ltd. ("Dickerson") gave him standing to pursue such claims, filed two Adversary Proceedings against agencies of the United States Government seeking a recovery – by way of turnover, of funds that were owed to Dickerson.  On June 30, 2009 Adversary Proceeding No. 09-03246 was filed in this Court by the Debtor against the United States Federal Emergency Management Agency ("FEMA") to recover approximately $209,254.35 which was

claimed due by Dickerson for costs and expenses of keeping Dickerson open during Hurricane Rita in 2005. Also on June 30, 2009, Adversary Proceeding No. 09-03247 was filed in this Court by the Debtor against The United States Department of Health and Human Services to recover certain transitional corridor payments for years 2001 through and including 2005 in the aggregate amount of $1,159,326.00. Both of these Adversary Proceedings were dismissed on September 30, 2009 after the Debtor's counsel had discussed these claims at length with an attorney from the United States Department of Justice, who provided ample statutory and case authority which demonstrated that the Debtor did not have the requisite standing to pursue these claims. As a result, they are solely the right and property of Dickerson and will be pursued by Dickerson in the appropriate forum. The Debtor has amended his bankruptcy schedules to reflect the fact that these claims are no longer to be considered as his personal assets.

On November 25, 2009, the Debtor filed his Original Plan of Reorganization and his Original Disclosure Statement.

On January 18, 2010, the Debtor filed his First Amended Plan of Reorganization and First Disclosure Statement.

## IV.    THE PLAN

**The following is a summary of certain significant provisions of the Amended Plan. This summary is qualified in its entirety by reference to the more detailed information set forth in the Amended Plan. To the extent that the terms of the Disclosure Statement vary from the terms of the Amended Plan or the Amended Plan Documents, the terms of the Amended Plan and the Amended Plan Documents shall control. A true and correct copy of the Amended Plan is attached hereto and incorporated herein by reference for all purposes as <u>Exhibit "1"</u>.**

### A.    General.

Chapter 11 is the principal business reorganization chapter of the Bankruptcy Code. Under Chapter 11, the Debtor is authorized to reorganize its business for the benefit of itself and its creditors and interest holders.

### B.    Summary of Plan Classification and Treatment.

A brief summary of the Amended Plan is set forth below. This summary does not purport to be a complete restatement of the Amended Plan and should not be relied upon by you for voting purposes. All creditors and parties-in-interest are urged to read the Amended Plan in full before voting to accept or reject the Amended Plan. A true and correct copy of the Debtor's Amended Plan of Reorganization is attached hereto as <u>**Exhibit "1."**</u> Creditors and parties-in-interest are further urged to consult with their respective legal counsel or other qualified advisor prior to voting to accept or reject the Amended Plan.

The Amended Plan contemplates that the Debtor, Lawrence J. Wedekind, individually, will retain his current form of doing business as an individual and corporate officer, and will

continue to act as an officer of IntegraNet Physician Resource, Inc., an Independent Physician Organization ("IPO"), a medical management business in Houston, Texas.  After the payment of his personal costs and living expenses, including personal property taxes and current income taxes, the Debtor will employ a substantial portion of his future net income derived from his earnings to fund the Amended Plan for the satisfaction of his creditor's claims as provided therein.

The money obtained from the Debtor's employment which is intended for use in the payment of creditors' claims is defined as "Net Distributable Income" in the Amended Plan. Other than the Net Distributable Income from the Debtor's employment, recovery of the 2008 tax refund of $46,442.00, the approximate $40,000 deposited on a postpetition basis with Omnibank USA pursuant to the Court's prior order, and the possible recovery on receivables owed to Dickerson Memorial Hospital, Ltd., the Amended Plan does not anticipate any other source of funds being available for the payment of creditors' claims.  The Amended Plan designates six (6) classes of creditors, including those classes whose members are limited to the holders of administrative and priority claims. Creditors listed in Classes 1 & 4 are considered **unimpaired** within the meaning of 11 U.S.C. §1124 of the Code.  Classes 2, 3 and 5 are considered impaired within the meaning of 11 U.S.C. §1124.

## CREDITOR CLASSES

| Class 1 | Administrative Claims | | Unimpaired |
|---------|----------------------|-----------|------------|
| | United States Trustee | $2,000.00 | Based on amounts disbursed |
| | Leonard H. Simon | $15,000.00 | Subject to fee application |
| | James R. Clark | $0.00 | Subject to fee application |
| | Michael P. Jayson, CPA | $10,000.00 | Subject to fee application |
| **TOTAL CLASS 1 CLAIMS** | | **$27,000.00** | |

PLAN TREATMENT:

All Administrative Claims allowed by the Court as of the Confirmation Date shall be paid by Debtor in full on the Consummation Date unless a particular administrative creditor agrees to other treatment.  To the extent an Administrative Claim is allowed after the Confirmation Date, Debtor shall pay such claim on the date the order allowing such claim becomes a Final Order.

| Class 2 | IRS Secured Claim | Amount | Objection-Impairment |
|---------|------------------|--------|----------------------|
| | Internal Revenue Service | $30,885.00 | Objection to be filed.    To the extent the IRS claim exceeds value of its collateral, it shall be treated in Class 3 as a priority claim.  Complaint or Motion to be filed pursuant to 11 U.S.C. § 505 objecting to, and seeking a determination of, amount of tax liability based on reasonable cause defense.  This claim is impaired.  The Debtor believes that the IRS claim in this Class will equal $30,885.00, the value of the collateral securing such claim.. |
| **TOTAL CLASS 2 CLAIMS** | | $30,885.00 | |

PLAN TREATMENT:

The allowed Secured Claim of the IRS in the amount of $30,885.00 shall be paid in monthly installments of principal and interest in the amount of  $554.96, as though amortized based on a 60 month amortization at a three percent rate of interest, with the final payment due on April 30, 2015.

| Class 3 | IRS Priority Claim | Amount | Objection-Impairment |
|---------|-------------------|--------|----------------------|
| | Internal Revenue Service | $2,267,940.49 | Objection to be filed.    To the extent the IRS claim exceeds value of collateral, it shall be treated in Class 3 as a priority claim.  Motion to be filed pursuant to 11 U.S.C. § 505 to determine amount of tax liability based on reasonable cause defense.  This claim is impaired.  For purposes of the Amended Plan, the IRS claim in this Class 3 will be temporarily allowed in the amount of $2,267,940.49, which is the amount stated in the IRS proof of claim, $2,298,825.49, less the amount of its Class 2 claim, $30,885.00. |

**TOTAL CLASS 3 CLAIMS          $2,267,940.49**

**PLAN TREATMENT:**

The allowed priority claim of the IRS in Class 3 in the amount of $2,267,940.49, shall be paid in accordance with Section 1129(a)(9)(c) of the Bankruptcy Code in monthly installments of principal and interest of $12,577.94 as though amortized based on a 240 month amortization at a three percent rate of interest, with the final payment due on March 30, 2014,  in the amount of $1,939,349.73.   As payments are received on Dickerson's lawsuits to collect on claims it has against the United States Department of Health and Human Services for what is known as transitional corridor payments, and against the United States Federal Emergency Management Agency ("FEMA") for claims attributable to housing people during Hurricane Rita in 2005, such payments shall be applied to reduce the IRS allowed priority claim in this Class.  If the allowed claim of the IRS is redetermined as a result of Debtor's motion or complaint pursuant to 11 U.S.C. § 505, the amortized payments shall be recalculated and re-adjusted accordingly.

| Class 4 | Omnibank, USA Secured Claim | Amount | Objection-Impairment |
|---------|-------------------|--------|----------------------|
| | Omnibank, USA | $91,999.96 | Omnibank, USA is the holder of a promissory note in the original principal amount of $1,250,000 secured  by four life insurance policies listed on the Debtor's Amended Schedule B. To the extent the cash surrender value of these life insurance policies, such claim shall be allowed secured claim in this Class 4.     This Claim shall be unimpaired.  Debtor waives any objections to this claim, and this Claim shall be allowed in the amount of $91,999.96, the cash surrender value of the insurance policies securing such claim. |

**TOTAL CLASS 4 CLAIMS          $91,999.96**

**PLAN TREATMENT:**

The allowed Secured Claim of Omnibank USA in Class 4 in the amount of $91,999.96 shall be paid in one installment by the Debtor's spouse, Debora Lynn Wedekind, on or before the expiration of sixty days from the Effective Date.  In exchange for such payment the insurance policies described in paragraph 3.2.4 of the Amended Plan, shall be transferred to the Debtor's spouse free and clear of liens, claims and encumbrances.  In order to raise the funds to make this payment, Mr. or Mrs. shall be permitted to borrow under the policies immediately following the Court's Confirmation of the Amended Plan.  Omnibank USA shall assist Mr. or Mrs. Wedekind in this effort by notifying the insurance companies of its approval for this borrowing.

.

| Class 5 | Unsecured General Claims | Amount | Objection-Impairment |
|---------|--------------------------|--------|----------------------|
| | David Mosig | $ 33,333.35 | Possible Objection with respect to Allowed Amount of Claim |
| | John Tatum | 355,211.11 | Allowed as filed |
| | Omnibank, USA | 940.05 | This Claim was asserted in a proof of claim filed by Omnibank USA on April 28, 2009.  This claim shall be allowed in the amount stated in the proof of claim. |
| | Omnibank, USA | 1,224,162.49 | This Claim was asserted in a proof of claim filed by Omnibank USA on April 28, 2009.  Subject to proof of how the amount stated in the proof of claim was determined by Omnibank, this claim shall be allowed in the amount of $1,224,162.49, the amount stated in the proof of claim, $1,316,162.45, less $91,999.96, the amount of the Omnibank Class 5 Secured Claim.  Debtor's liability to Omnibank USA is based on a guaranty of various promissory notes executed by Dickerson to Omnibank USA.  Dickerson and/or its general partner, Greater Gulf Medical Alliance, Inc., may have claims against Omnibank USA for predatory lending or lender liability.  Such claims were listed in Debtor's Amended Schedule B filed on November 25, 2009.  Debtor, however, agrees not pursue such claims in his individual capacity.  To the extent that the result of the Dickerson litigation is to reduce or eliminate the underlying promissory notes from Dickerson to Omnibank USA, such determination will reduce or eliminate Omnibank USA's claims against Debtor in this case, and the Plan payments to Omnibank USA shall be accordingly adjusted. |
| | Omnibank, USA | 577,785.95 | This Claim was asserted in a proof of claim filed by Omnibank USA on April 28, 2009.  Subject to proof of how the amount stated in the proof of claim was determined by Omnibank USA, and proof that the statute of limitation on this claim has not run, this claim shall be allowed in the amount stated in the proof of claim.  If it appears that limitations bars this claim, an objection will be filed by the Debtor on or before the expiration of thirty days from the Effective Date.  Debtor's liability to Omnibank USA is based on a guaranty of various promissory notes executed by Dickerson to Omnibank USA.  Dickerson and/or its general partner, Greater Gulf Medical Alliance, Inc., may have claims against Omnibank USA for predatory lending or lender liability.  Such claims were listed in Debtor's Amended Schedule B filed on November 25, 2009.  Debtor, however, agrees not pursue such claims in his individual capacity.  To the extent that the result of the Dickerson litigation is to reduce or eliminate the underlying promissory notes from Dickerson to Omnibank USA, such determination will reduce or eliminate Omnibank USA's claims against Debtor in this case, and the Plan payments to |

| | | |
|---|---|---|
| | | Omnibank USA shall be accordingly adjusted. |
| American Express Co. | 11,053.59 | American Express has filed three proofs of claim in this case totaling $11,053.59.  Subject to final review of these claims by the Debtor, such claims shall be allowed. |
| Max Recovery Trust I, Successor to Sears | 2,373.70 | Max Recover filed a proof of claim for this amount.  Subject to final review by the Debtor, such claim shall be allowed. |
| Discovery Ranch (and it's Debt Collection agencies) | 11,000.00 | |
| North Idaho Credit Corporation | 25,960.53 | 1919 N. 3rd Street, Coeur D' Alene, ID 83814 (Reference Packet No. 0688618) |

**TOTAL CLASS 5 CLAIMS**       **$2,241,820.77**

**PLAN TREATMENT:**

Each allowed unsecured claim in Class 5 shall be paid a 12% dividend payable in one hundred twenty monthly installments commencing on June 1, 2010, with no interest.  Based on total claims in the amount of $2,191,432.95, a 12% dividend would be $262,971.954, with a monthly payment of $2,191.43.

## EQUITY SECURITY HOLDER

The sole equity security holder is Larry J. Wedekind.  Mr. Wedekind will not retain any interest in property of the estate that has not been not determined to be exempt.

### C.      Means for Execution of the Amended Plan

1.      **Sources of Funds**.  The primary source of funds for the payment of the IRS's priority claim in Class 3 and the claims of unsecured creditors in Class 5 is the Net Distributable Income from the Debtor's employment.  Additionally, Class 3 and Class 5 monthly payments will be made from a tax refund that is due to the Debtor in the amount of $46,442.00, for tax year 2008, and from approximately $40,000 deposited on a postpetition basis with Omnibank USA pursuant to the Court's prior order.  The Debtor anticipates that some or all of the IRS' claim in Class 3 will be paid out of Dickerson's lawsuits to collect on claims it has against the United States Department of Health and Human Services for what is known as transitional corridor payments, and against the United States Federal Emergency Management Agency ("FEMA") for claims attributable to housing people during Hurricane Rita in 2005.

2.      **Disbursement of Payments.**  All payments to be made by the Debtor under this Plan to the holders of all classes of claims shall be made by the Disbursing Agent from funds provided as set forth in Article V of the Amended Plan.

3.      **Disbursing Agent.**  The Disbursing Agent shall be the Debtor's accountant, Mr. Michael P. Jayson, CPA.

4.      **Disbursing Agent's Duties**.  The Disbursing Agent shall, on account of claims of such creditors, deposit such funds in a non-interest bearing account in a banking institution

approved for deposit of funds held in the Registry of the United States District Court for the Southern District of Texas or as approved by the Office of the United States Trustee for said District. Thereafter, the Disbursing Agent shall disburse to creditors of the Debtor in accordance with this Plan, and with the order confirming the Amended Plan, all distributions in partial or complete satisfaction of each creditors' claims.

5.  **Costs of the Disbursing Agent.**  All costs, expenses and obligations incurred by the Disbursing Agent in discharging the duties hereinabove described or in any manner connected, incidental or related thereto, shall be a charge only against the funds which may be subject to his control.  The Disbursing Agent shall have authority to employ one or more attorneys, accountants, or other professionals, as he deems necessary to assist him in the performance of the duties described in paragraph 5.04 hereof and the cost to the Disbursing Agent for the services of such attorneys, accountants or other professionals shall only be recoverable hereunder from the Debtor directly and not from the funds deposited for creditors.

6.  **Compensation of the Disbursing Agent.**  The Disbursing Agent shall receive an initial set–up fee of $500.00 from the Debtor as compensation for setting up the payment procedures and $200.00 per month thereafter for performing his duties set forth above.

7.  **Post-Confirmation Default by Debtor.**  Upon the entry of a final order confirming this Plan, the creditors of the Debtor holding secured claims of any class shall be authorized to employ any applicable non-bankruptcy remedy against such property of the estate of the Debtor which secures the payment of such claims without further order of the Court, upon the Debtor's default in the payment of such claim as provided in this Plan or upon the Debtor's default in the performance of any non-monetary duty imposed on the Debtor under the terms of any mortgage, deed of trust, security agreement, promissory note or other instrument providing for such duties, provided as follows:

(A)  The holder of such claim shall provide written notice of such default to the Debtor, the Debtor's counsel and the Disbursing Agent; and

(B)  Advise the Debtor in the written notice provided for in the above and foregoing paragraph (A) of this paragraph 5.07 that the Debtor shall have thirty (30) days to cure such default and the consequences of the Debtor's failure to do so.

Nothing contained in this paragraph 5.7 shall, in any way, alter the legal, equitable or contractual rights of any creditor of the Debtor whose claim is unimpaired under this Plan.  To the extent that anything contained in this paragraph conflicts with any statute, ordinance, regulation, decision, rule of law or contractual provision which provides for the legal, equitable, or contractual rights of such unimpaired creditors, then such statute, ordinance, regulation, decision, rule of law or contractual provision shall control.

8.  Insurance.  The Debtor will continue to maintain life insurance on himself and casualty insurance on his property.

### 2.     Management of the DEBTOR.

Lawrence J. Wedekind, Debtor, will continue to manage his business affairs as the Debtor, and will receive from his employer's medical management business the funds necessary to pay the Debtor's operating expenses and the Amended Plan payments scheduled hereunder.  The key value of Mr. Wedekind's business is derived from the services provided to his employer and its clients. Mr. Wedekind has enabled his employer to develop a physician network of more than 1200 active physicians.  The Debtor's significant asset is his ability to manage the medical service network which he has created and developed into what it is today.  The Debtor does not have any ownership interest in his employer, IntegraNet, and is dependent on its continued growth, profitability and existence to continue to earn a substantial amount of compensation with which he can fund his Plan of Reorganization. The Debtor is confident that, should anything happen to IntegraNet,  he would be able to affiliate himself with another medical management organization at the same or greater level of compensation he is currently receiving. His skills have been proven for over 20 years and he believes that the majority, if not all, of his employer's clients or contacts would reasonably be expected to follow him to another office. As is true with virtually every manager of an organization the size of IntegraNet, the only professional assets of real value the Debtor has are his training, skills, expertise and reputation.

### 3.     Sources of Cash to Fund the Amended Plan

The Amended Plan contemplates that the Debtor, Lawrence J. Wedekind, individually, will retain his current form of doing business as an individual and corporate officer, and will continue to act as an officer of IntegraNet Physician Resource, Inc., an Independent Physician Organization ("IPO"), a medical management business in Houston, Texas.  After the payment of his personal costs and living expenses, including personal property taxes and current income taxes, the Debtor will employ a substantial portion of his future net income derived from his earnings (the "Net Distributable Income") to fund the Amended Plan for the satisfaction of his creditor's claims as provided therein.

The primary source of funds for the payment of the IRS's priority claim in Class 3 and the claims of unsecured creditors in Class 5 is the Net Distributable Income from the Debtor's employment.  Additionally, Class 3 and Class 5 monthly payments will be made from a tax refund that is due to the Debtor in the amount of $46,442.00, for tax year 2008, and from approximately $40,000 deposited on a postpetition basis with Omnibank USA pursuant to the Court's prior order. The Debtor anticipates that some or all of the IRS' claim in Class 3 will be paid out of Dickerson's lawsuits to collect on claims it has against the United States Department of Health and Human Services for what is known as transitional corridor payments, and against the United States Federal Emergency Management Agency ("FEMA") for claims attributable to housing people during Hurricane Rita in 2005.

### D.     Executory Contracts and Unexpired Leases

**Assumption or Rejection; Rejection Claims.**  Under Section 365 of the Bankruptcy Code, the Debtor has the right, subject to Bankruptcy Court approval, to assume or reject any executory contracts or unexpired leases. If the Debtor rejects an executory contract or unexpired lease that was entered into before the Filing Date, it will be treated as if it had been breached on

the date immediately preceding the Filing Date, and the other party to the agreement may assert a General Unsecured Claim in Class 3 for damages incurred as a result of the rejection. In the case of rejection of employment agreements and real property leases, damages are subject to certain limitations imposed by Sections 365 and 502 of the Bankruptcy Code.

**Assumed Contracts and Leases; Related Payments.**  Except as otherwise provided, as of the Confirmation Date, the Debtor will be deemed to have rejected each executory contract and unexpired lease to which it or the the Debtor Bankruptcy Estate is a party, except for those specifically listed on Schedule G of the Debtor's Schedules, as amended, which shall be deemed assumed as of the Confirmation Date.

**Rejected Contracts and Leases: Bar to Rejection Damages.**  If the rejection by the Debtor pursuant to the Amended Plan or otherwise of an executory contract or unexpired lease results in a Claim that is not theretofore evidenced by a timely proof of Claim or a proof of Claim that is deemed to be filed timely under applicable law, then such Claim will be forever barred and unenforceable against the the Debtor Bankruptcy Estate, unless a proof of Claim is filed with the clerk of the Court and served on counsel for the Debtor within thirty (30) days after notice of entry of an order that the executory contract or unexpired lease has been rejected**.**

### E.      Conditions Precedent to the Effective Date

The occurrence of each the following events shall be a separate condition to the Effective Date:

### 1.      Entry of Confirmation Order

The Confirmation Order shall have been signed by the Court and duly entered on the Court's docket in form and substance acceptable to the Debtor, and shall include, among other things, findings of fact and/or conclusions of law that:

a.  approve the terms of the Amended Plan, as it may be amended or modified, and all other agreements contemplated by the Amended Plan;

b.  approve the terms of the Amended Plan, as it may be amended or modified, and all other agreements contemplated by the Amended Plan;

c.  provide that, except as otherwise expressly provided in the Amended Plan, all entities who have held, hold or may hold Claims against, or Interest in, the Debtor's Bankruptcy Estate will be permanently enjoined, on and after the Confirmation Date, from (i) commencing or continuing in any manner any action or other proceeding of any kind with respect to any such Claim, (ii), the enforcement, attachment, collection or recovery by any manner or means of any judgment, award, decree or order against the Debtor or the Debtor's Bankruptcy Estate on account of any such Claim, (iii) creating, perfecting or enforcing any encumbrance of any kind against the Debtor or the Debtor's Bankruptcy Estate on account of any such Claim, and (iv) asserting any right of setoff, subrogation or recoupment of any kind against any obligation due

from the Debtor or the Debtor's Bankruptcy Estate on account of any such Claim; provided however, notwithstanding any provision of the Amended Plan to the contrary, each holder of an Allowed Claim shall be entitled to enforce his, her or its rights under the Amended Plan;

d. reserve the jurisdiction of the Bankruptcy Court in accordance with Article 11 of the Amended Plan;

e. terminate the automatic stay under Section 362 of the Bankruptcy Code; and

f. provide, pursuant to Section 1125(e) of the Bankruptcy Code, that persons who have solicited acceptances or rejections of the Amended Plan have acted in good faith and in compliance with the provisions of the Bankruptcy Code, and are not liable on account of such solicitation or participation for violation of any applicable law, rule, or regulation governing the solicitation of acceptances or rejections of the Amended Plan.

### 2. Finality of Confirmation Order; Waiver

The Confirmation Order, in form and substance satisfactory to the Debtor shall either have become a Final Order, or such condition shall have been waived by the Debtor.

### F. Good Faith Solicitation Under § 1125.

The Plan provides that the Debtor, upon Confirmation of the Amended Plan, shall be deemed to have solicited acceptances of the Amended Plan in good faith and in compliance with the applicable provisions of the Bankruptcy Code and that the Debtor (and its affiliates, agents, employees, advisors and attorneys) have participated in good faith and in compliance with the applicable provisions of the Bankruptcy Code, and therefore is not and will not be, liable at any time for the violation of any applicable law, rule or regulation governing the solicitation of acceptances or rejections of the Amended Plan.

### H. Effect of Confirmation of the Amended Plan.

### 1. Binding Effect.

The Plan shall be binding upon Debtor and all present and former holders of Claims and Interests and their respective successors and assigns.

### 2. Moratorium, Injunction and Limitation of Recourse For Payment.

Except as otherwise expressly provided in the Amended Plan, all entities who have held, hold or may hold Claims against, or Interest in, the Debtor's Bankruptcy Estate or Debtor will be permanently enjoined, on and after the Consummation Date, from (i) commencing or continuing in any manner any action or other proceeding of any kind with respect to any such Claim or Interest against Debtor or Debtor's attorneys and agents, (ii), the enforcement, attachment,

collection or recovery by any manner or means of any judgment, award, decree or order against Debtor or the Debtor's Bankruptcy Estate or property or interests in property of Debtor or the Debtor's Bankruptcy Estate, (iii) creating, perfecting or enforcing any encumbrance of any kind against Debtor or the Debtor's Bankruptcy Estate or property or interests in property of Debtor or the Debtor's Bankruptcy Estate on account of any such Claim or Interest and (iv) asserting any right of setoff, subrogation or recoupment of any kind against any obligation due from Debtor or the Debtor's Bankruptcy Estate or property or interests in property of Debtor or the Debtor's Bankruptcy Estate on account of any such Claim or Interest.

## 3. Exculpation and Limitation of Liability.

Neither the Debtor's Bankruptcy Estate, nor Debtor, nor any present or former employee, advisor, attorney, or agent will have or incur any liability to any holder of a Claim or an Interest, or any other party in interest, or any of their respective agents, employees, representatives, financial advisors, attorneys, or affiliates, or any of their successors or assigns, for any act or omission in connection with, relating to, or arising out of, the solicitation of votes to accept the Amended Plan, the Debtor's Bankruptcy Case, the pursuit of confirmation of the Amended Plan, the consummation of the Amended Plan, or the administration of the Amended Plan or the property to be distributed under the Amended Plan, except for their willful misconduct, and in all respects shall be entitled to reasonably rely upon the advice of counsel with respect to their duties and responsibilities under the Amended Plan.

Notwithstanding any other provision of the Amended Plan, no holder of a Claim or Interest, no other party in interest, none of their respective agents, employees, representatives, financial advisors, attorneys, or affiliates, and no successors or assigns of the foregoing, will have any right of action against the Debtor's Bankruptcy Estate or Debtor, or any present or former employee, advisor, attorney, or agent, for any act or omission in connection with, relating to, or arising out of the solicitation of votes to accept the Amended Plan, the pursuit of confirmation of the Amended Plan, the consummation of the Amended Plan, or the Debtor Bankruptcy Case, administration of the Amended Plan or the property to be distributed under the Amended Plan, except for their willful misconduct.

4. Vesting.

Except as otherwise provided in the Amended Plan or the Confirmation Order, pursuant to §§ 1123(a)(5) and 1141, on the Effective Date, all property of the Debtor and Estate of the Debtor shall vest in the Debtor free and clear of all Claims and Liens of Creditors, except as provide for in Article IV of the Amended Plan.  From and after the Effective Date, Debtor may operate its business and may use, acquire, and dispose of property, and settle and compromise Claims or Interests without supervision of the Bankruptcy Court and free of any restrictions of the Bankruptcy Code, subject to the terms and conditions of the Amended Plan.  Debtor will retain his exempt property as permitted by applicable laws.

## 5. Retention and Enforcement of Causes of Action.

The Debtor is currently not involved in any active litigation.  The Debtor, operating under the assumption that the claims assigned to him from Dickerson Memorial Hospital, Ltd.

("Dickerson") gave him standing to pursue such claims, filed two Adversary Proceedings against agencies of the United States Government seeking a recovery – by way of turnover, of funds that were owed to Dickerson.  On June 30, 2009 Adversary Proceeding No. 09-03246 was filed in this Court by the Debtor against the United States Federal Emergency Management Agency ("FEMA") to recover approximately $209,254.35 which was claimed due by Dickerson for costs and expenses of keeping Dickerson open during Hurricane Rita in 2005.  Also on June 30, 2009, Adversary Proceeding No. 09-03247 was filed in this Court by the Debtor against The United States Department of Health and Human Services to recover certain transitional corridor payments for years 2001 through and including 2005 in the aggregate amount of $1,159,326.00.  Both of these Adversary Proceedings were dismissed on September 30, 2009 after the Debtor's counsel had discussed these claims at length with an attorney from the United States Department of Justice, who provided ample statutory and case authority which demonstrated that the Debtor did not have the requisite standing to pursue these claims.  As a result, they are solely the right and property of Dickerson and will be pursued by Dickerson in the appropriate forum.  The Debtor has amended his bankruptcy schedules to reflect the fact that these claims are no longer to be considered as his personal assets.

Except as otherwise provided in the Amended Plan, Debtor, as of the Confirmation Date, shall own all of the claims owned by the Debtor's Bankruptcy Estate, and may enforce, sue on, settle or compromise (or decline to do any of the foregoing) any or all of such claims.  Debtor's liability to Omnibank USA is based on a guaranty of various promissory notes executed by Dickerson to Omnibank USA.  Dickerson and/or its general partner, Greater Gulf Medical Alliance, Inc., may have claims against Omnibank USA for predatory lending or lender liability.  Such claims were listed in Debtor's Amended Schedule B filed on November 25, 2009.  Debtor, however, agrees that he will not pursue such claims in his individual capacity.  To the extent any of the underlying promissory notes from Dickerson to Omnibank USA are determined to be reduced or eliminated, such determination may reduce or eliminate Omnibank USA's claims against Debtor in this case.  Debtor may have a defense of limitations with respect to Omnibank USA's proof of claim in the amount of $577,785.95.  Additionally, the Debtor would like to review Omnibank USA's calculations of the amounts stated in the proofs of claim filed, as there is no analysis in such proofs of claim as to how the amounts claimed were calculated.  Subject to such further analysis, Debtor may or may not object to Omnibank USA's proofs of claim.

### 6.      Distributions Under the Amended Plan.

See Articles 4 and 5 of the Amended Plan for a detailed description of the procedures by which Distributions will be made to the holders of Allowed Claims.

### 7.      Retention of Jurisdiction.

Under 11 U.S.C. §§ 105(a) and 1142, and notwithstanding entry of the Confirmation Order and passage of the Consummation Date, the Court shall retain exclusive jurisdiction over all matters arising out of, and related to, the Chapter 11 Case and the Amended Plan to the fullest extent permitted by law, including, among other things, jurisdiction to:

a.      Allow, disallow, determine, liquidate, classify, estimate or establish the

priority or secured or unsecured status of any Claim or Interest, including the resolution of any request for payment of any Administrative Claim or Priority Claim or the resolution of any objections to the allowance or priority of Claims or Interest;

b.      Hear and determine all applications for compensation and reimbursement of expenses of Administrative Claims or Priority Claims;

c.      Hear and determine all matters with respect to the assumption or rejection of any executory contract or unexpired lease to which the Debtor is a party or with respect to which the Debtor may be liable, including, if necessary, the liquidation or allowance of any Claims arising therefrom;

d.      Effectuate performance of and payments under the provisions of the Amended Plan;

e.      Enter such orders as may be necessary or appropriate to execute, implement, or consummate the provisions of the Amended Plan, and all contracts, instruments, releases, and other agreements or documents created in connection with the Amended Plan, the Disclosure Statement or the Confirmation Order;

f.      Hear and determine disputes arising in connection with the interpretation, implementation, consummation, or enforcement of the Amended Plan, including disputes arising under agreements, documents or instruments executed in connection with the Amended Plan;

g.      Consider any modifications of the Amended Plan, cure any defect or omission, or reconcile any inconsistency in any order of the Bankruptcy Court, including, without limitation, the Confirmation Order;

h.      Issue injunctions, enter and implement other orders, or take such other actions as may be necessary or appropriate to restrain interference by any entity with implementation, consummation, or enforcement of the Amended Plan or the Confirmation Order;

i.      Enter and implement such orders as may be necessary or appropriate if the Confirmation Order is for any reason reversed, stayed, revoked, modified, or vacated;

j.      Hear and determine any matters arising in connection with or relating to the Amended Plan, the Disclosure Statement, the Confirmation Order or any contract, instrument, release, or other agreement or document created in connection with the Amended Plan, the Disclosure Statement or the Confirmation Order;

k.     Enforce all orders, judgments, injunctions, releases, exculpations, indemnifications and rulings entered in connection with the the Debtor Bankruptcy Case;

l.     Hear and determine matters concerning state, local, and federal taxes in accordance with 11 U.S.C. §§ 346, 505, and 1146;

m.     Hear and determine all matters related to the property of the the Debtor Bankruptcy Estate from and after the Effective Date;

n.     Hear and determine such other matters as may be provided in the Confirmation Order and as may be authorized under the provisions of the Bankruptcy Code; and

o.     Enter a final decree closing the the Debtor Bankruptcy Cases.

**8.     Amendment and Modification to the Amended Plan.**

The Debtor may alter, amend, or modify the Amended Plan or any Exhibits thereto under Section 1127(a) of the Bankruptcy Code at any time prior to the Confirmation Date. After the Confirmation Date and prior to the earlier of (i) the Consummation Date; or (ii) Substantial Consummation of the Amended Plan, the Debtor may, under Section 1127(b) of the Bankruptcy Code, institute proceedings in the Bankruptcy Court to remedy any defect or omission or reconcile any inconsistencies in the Amended Plan, the Disclosure Statement approved with respect to the Amended Plan, or the Confirmation Order, and such matters as may be necessary to carry out the purpose and effect of the Amended Plan so long as such proceedings do not adversely affect the treatment of holders of Claims or Equity Interests under the Amended Plan; provided, however, prior notice of such proceedings shall be served in accordance with the Bankruptcy Rules or order of the Bankruptcy Court.

**9.     Withdrawal and Revocation of the Amended Plan.**

the Debtor reserves the right to revoke or withdraw the Amended Plan prior to the Confirmation Date and to file subsequent plans of reorganization. If the Debtor revokes or withdraws the Amended Plan, then (a) the Amended Plan shall be null and void in all respects; (b) any settlement or compromise embodied in the Amended Plan (including the fixing or limiting to an amount certain any Claim or Class of Claims), assumption or rejection of executory contracts or leases affected by the Amended Plan, and any document or agreement executed pursuant to the Amended Plan, shall be deemed null and void; and (c) nothing contained in the Amended Plan shall (i) constitute a waiver or release of any Claims by or against, or any Equity Interests in, the Debtor; (ii) prejudice in any manner the rights of the Debtor or any other person; or (iii) constitute an admission of any sort by the the Debtor or any other person.

## V.      THE PROJECTIONS

The Plan provides for the reorganization of the Debtor.  The Bankruptcy Code requires that confirmation of the Amended Plan is not likely to be followed by liquidation or the need for further financial reorganization.  For purposes of determining whether the Amended Plan meet this requirement, the Debtor has projected that it will be in a position to fund monthly payments of $15,000.00 each for a period of 60 months in order to satisfy the minimum requirements of the Amended Plan.  *See* Plan Projections attached hereto as **Exhibit "2"** and incorporated herein by reference for all purposes.

The Debtor that he will be able to make all payments required pursuant to the Amended Plan and, therefore, that Confirmation of the Amended Plan is not likely to be followed by liquidation or the need for further reorganization.

## VI.     RISK FACTORS

Holders of Claims should read and consider carefully the factors set forth below, as well as the other information set forth in this Disclosure Statement (and the documents delivered together herewith and/or incorporated by reference herein), prior to voting to accept or reject the Amended Plan.

### A.      Business Risks.

The ability of the Debtor to satisfy plan payments is entirely dependent upon his future employment for income.  Should such decrease; a significant impairment of the Debtor's ability to operate economically could result.  A corresponding result from such occurrence would be an inability on the part of the Debtor to satisfy the claims of creditors pursuant to the Amended Plan. As a result, the Debtor is attempting to commence making payments to creditors quickly in order to be certain that the Twelve Percent Dividend (12%) will be fully paid.

### B.      Risk of Non-Confirmation of the Amended Plan.

Even if all Classes of Claims or Interests that are entitled to vote to accept the Amended Plan, the Amended Plan might not be confirmed by the Bankruptcy Court.  Section 1129 sets forth the requirements for confirmation and requires, among other things, that the Confirmation of the Amended Plan is not likely to be followed by the liquidation or the need for further financial reorganization of the Debtor, and that the value of Distributions to dissenting Creditors and Interest holders not be less than the value of Distributions such Creditors and Interest holders would receive if the Debtor was liquidated under Chapter 7.  The Debtor and its principals believe that the Amended Plan satisfies all the requirements for Confirmation under the Bankruptcy Code.  There can be no assurance, however, that the Bankruptcy Court will also conclude that the requirements for Confirmation of the Amended Plan have been satisfied.

### C.      Nonoccurrence of Effective Date of the Amended Plan.

Even if all Classes of Claims and Interests that are entitled to vote accept the Amended

Plan, the Effective Date for the Amended Plan may not occur.  The Plan sets forth conditions to the occurrence of the Effective Date of the Amended Plan which may not be satisfied by the Effective Date.  The Debtor and its principals believe that the Debtor will satisfy all requirements for consummation required under the Amended Plan.  There can be no assurance, however, that the Bankruptcy Court will also conclude that the requirements for consummation of the Amended Plan have been satisfied.

## VII.   CONFIRMATION OF THE PLAN

### A.   Voting Procedures and Requirements.

The Debtor is providing copies of this Disclosure Statement and Ballots to all known holders of Impaired Claims who are entitled to vote on the Amended Plan.

Pursuant to the provisions of the Bankruptcy Code, only Classes of Claims in the Debtor that are "Impaired" under the terms and provisions of the Amended Plan and entitled to receive a Distribution thereunder are entitled to vote to accept or reject the Amended Plan.  Accordingly, Classes of Claims or Interests that are not Impaired under the terms and provision of the Amended Plan are *not* entitled to vote on the Amended Plan.  In addition, Classes of Claims or Interests that are not entitled to a Distribution under the terms and provisions of the Amended Plan are deemed to have rejected the Amended Plan and are not entitled to vote to accept or reject the Amended Plan.

Under the Amended Plan, holders of Claims in Classes 2, 3, and 5 are Impaired and, therefore, are entitled to vote to accept or reject the Amended Plan   The following voting procedures (the "Voting Procedures") have been established with respect to the amount and classification of Claims and Interests, and the determination of the validity of Ballots submitted, for voting purposes:

1.   Unless otherwise provided below, a claim will be deemed temporarily allowed for voting purposes in an amount equal to (i) if a timely filed proof of claim has not been filed, the amount of such claim as set forth in the schedules of assets and liabilities, filed by the Debtor or (ii) the amount of such claim as set forth in a timely filed proof of claim.

2.   If a claim is deemed allowed in accordance with the Amended Plan, such claim will be allowed for voting purposes in the deemed allowed amount set forth in the Amended Plan.

3.   If a claim has been estimated or otherwise allowed for voting purposes by order of the Court, such claim will be temporarily allowed for voting purposes in the amount so estimated or allowed by the Court.

4.   Ballots that are otherwise validly executed but do not indicate either acceptance or rejection of the Amended Plan will not be counted.

5.   Only Ballots that are timely received with signatures will be counted.  Unsigned ballots will not be counted.

6.      Ballots postmarked prior to the Voting Deadline, but received after the Voting Deadline, will be counted.

7.      Ballots that are illegible, or contain insufficient information to permit the identification of the creditor, will not be counted.

8.      If a creditor simultaneously casts inconsistent duplicate ballots, with respect to the same claim, such ballots shall not be counted.

9.      Unless otherwise ordered by the Court, questions as to the validity, form, eligibility (including time of receipt), acceptance, and revocation or withdrawal of ballots shall be determined by the Bankruptcy Court at the Confirmation Hearing.

10.     **IN ORDER TO BE COUNTED, EXCEPT TO THE EXTENT THE PLAN PROPONENTS SO DETERMINE OR AS PERMITTED BY THE BANKRUPTCY COURT PURSUANT TO BANKRUPTCY RULE 3018, BALLOTS MUST BE SIGNED AND RETURNED SO THAT THEY ARE RECEIVED NO LATER THAN 5:00 P.M. CENTRAL STANDARD TIME, ON _____, 2010 AT THE FOLLOWING ADDRESS:**

               Leonard H. Simon, Esq.
               PENDERGRAFT & SIMON, L.L.P.
               The Riviana Building
               2777 Allen Parkway, Suite 800
               Houston, Texas 77019
               (713) 528-8555 (Telephone)
               (713) 253-2810 (Mobile)
               (832) 202-2810 (Telecopy)
               Email:  lsimon@pendergraftsimon.com
               **ATTORNEY IN CHARGE FOR RIGHT OF WAY MAINTENANCE EQUIPMENT COMPANY**

11.     **BALLOTS WILL BE ACCEPTED BY REGULAR MAIL, FACSIMILE OR EMAIL**

12.     As mentioned above, if your Ballot is not signed and returned as described, it will not be counted.  If your Ballot is damaged or lost, or if you do not receive a Ballot, you may request a replacement by addressing a written request to Debtor's counsel at the above address by regular mail, facsimile or email.  Please follow the directions contained on the Ballot carefully.

13.     The process of soliciting acceptance of the Amended Plan must be fair and open without outside influence in the form of representations, inducements or duress of any kind.  To the extent that you believe solicitation of your vote from any party is being sought outside of the judicially-approved and statutorily-defined

disclosure requirements and Voting Procedures, please contact counsel for the Debtor.

**B.       Acceptance.**

Acceptance of the Amended Plan requires that each Impaired Class of Claims or Interests (as classified therein) accepts the Amended Plan, with certain exceptions hereinafter discussed below.  Thus, acceptance of the Amended Plan requires acceptance by each of the Impaired Classes.

Classes of Claims and Interests that are Unimpaired under the Amended Plan are deemed to have accepted the Amended Plan.  Acceptances of the Amended Plan are being solicited only from those persons who hold Claims or Interests of Impaired Classes.

The Bankruptcy Code defines acceptance of the Amended Plan by a Class of Claims as acceptance by the holders of at least two-thirds (2/3) in dollar amount and a majority in number of Claims of that class, but for that purpose, only those Claims, the holders of which actually vote to accept or reject the Amended Plan, are counted.

**C.       Confirmation of the Amended Plan.**

To confirm the Amended Plan, § 1129 requires the Bankruptcy Court to make a series of determinations concerning the Amended Plan, including, without limitation: (i) that the Amended Plan has classified Claims and Interests in a permissible manner; (ii) that the contents of the Amended Plan complies with the technical requirements of the Bankruptcy Code; (iii) that the Debtor has proposed the Amended Plan in good faith; and (iv) that the Debtor has made disclosures concerning the Amended Plan which are adequate and include information concerning all payments made or promised in connection with the Amended Plan and the Cases. The Plan Proponents believe that all of these conditions have been or will be met with respect to the Amended Plan.

The Bankruptcy Code requires that, unless the "cramdown" provisions of the Bankruptcy Code (as discussed below) are utilized, as a condition precedent to confirmation, the Amended Plan be accepted by the requisite votes of each Class of Claims and Interests voting as separate Classes.  Therefore, the Bankruptcy Court must find, in order to confirm the Amended Plan, that the Amended Plan has been duly accepted.  In addition, the Bankruptcy Court must find that the Amended Plan is feasible and that the Amended Plan is in the "best interests" of all holders of Claims and Interests.  Thus, even if holders of Claims were to accept the Amended Plan by the requisite number of votes, the Bankruptcy Court is still required to make independent findings respecting the Amended Plan's feasibility and whether the Amended Plan is in the best interests of holders of Claims and Interests before it can confirm the Amended Plan.

**D.       The Best Interests Test.**

Whether or not the Amended Plan is accepted by each Impaired Class of Claims entitled to vote on the Amended Plan, in order to confirm the Amended Plan the Bankruptcy Court must independently determine, pursuant to 11 U.S.C. § 1129(a)(7), that the Amended Plan is in the

best interests of each holder of an Impaired Claim or Interest that has not voted to accept the Amended Plan.  This requirement is satisfied if the Amended Plan provides each non-accepting holder of a Claim or Interest in such Impaired Class a recovery on account of such holder's Claim or Interest that has a value, as of the Effective Date, at least equal to the value of the Distribution each such holder would receive in a liquidation of the Debtor under Chapter 7.

To determine the value that holders of Impaired Claims and Interests would receive if the Debtor was liquidated under Chapter 7, the Bankruptcy Court must determine the aggregate dollar amount that would be generated from the liquidation of the Debtor's assets if the Cases were converted to Chapter 7 liquidation cases and the Debtor's assets were liquidated by a Chapter 7 trustee (the "Liquidation Value").  An analysis of the anticipated distribution which creditors of the Debtor would receive if this case is converted to one under Chapter 7 of the Code, assuming distress sale (and not "Fair Market") values of the Debtor's tangible, non-exempt assets, based on estimates of value provided by Mr. Wedekind, are as follows:

| Property | Sale Value | Sales Expense | Net Value |
|---|---|---|---|
| Cash | 100 | None | 100 |
| Special Trust Fund | 30,000 | None | 30,000 |
| Personal Property | 162,270 | None | 162,270 |
| Real Property | None | None | None |
| **Totals** | **$192,270** | **$0** | **$192,270** |

| Claim | Amount |
|---|---|
| Chapter 7 Trustee Fees and Costs | 4,868 |
| Chapter 7 Attorney, Accountant and Appraiser | 10,000 |
| IRS – Secured & Priority Taxes | 177,402 |
| Chapter 11 Professional Fees | 0 |
| **Total outlays prior to unsecured creditors** | **0** |
| **Payment to unsecured creditors** | **0** |

**\* Subject to the possible claim of OmniBank against certain life insurance policies.**

It is apparent that the Amended Plan provides a greater distribution to unsecured creditors

than would otherwise be received by them had this case been commenced, or if it is converted to one under Chapter 7 of the Code.  It also provides a <u>certainty</u> of repayment to the extent of the dividend treatment provided in the Amended Plan.  In a Chapter 7 case, any distribution by the Trustee after payment of the Trustee's fee, would be made to the taxing authorities, the holders of priority claims, in full satisfaction of the amount due from the Debtor, then to the perfected secured lien claimants, if any and, next, to tax claims.  Thereafter, if any funds remain, the other secured and unsecured creditors would then be paid.  Under the Chapter 11 Amended Plan, not only will the secured and priority creditors be paid in full (once those amounts are actually determined), the unsecured creditors of the Debtor will receive a distribution on account of their claims, without interest, the amount of which is equal to Twelve Percent (12%).  Such would not occur if the Debtor's property were sold for less than the estimated values stated above and his future income was not contributed to the Amended Plan.

The difference between the distribution which creditors would receive in a Chapter 7 case and the distribution which creditors would receive under the Amended Plan results largely from the Debtor's future income.  Unlike a Chapter 7 case, under the Amended Plan, the Debtor will contribute future income from his business or employment to satisfy claims of creditors. To the extent of any distribution to creditors from such future income, creditors will receive as much as, if not actually more than, they would if this case had been commenced or is converted to one under Chapter 7 of the Code, since the Debtor cannot normally be <u>required</u> to use future income.

###### E.    Feasibility.

Even if the Amended Plan is accepted by each Class of Claims and Interests voting on the Amended Plan, and even if the Bankruptcy Court determines that the Amended Plan satisfies the "best-interests" test, the Bankruptcy Code requires that, in order for the Amended Plan to be confirmed by the Bankruptcy Court, it must be demonstrated that consummation of the Amended Plan is not likely to be followed by the liquidation or the need for further financial reorganization of the Debtor.  For purposes of determining whether the Amended Plan meets this requirement, the Debtor has analyzed the Debtor's ability to meet his obligations under the Amended Plan. Based the evidence of financial ability to consummate the transactions contemplated herein, the Debtor believes that he will be able to make all payments required pursuant to the Amended Plan and, therefore, that Confirmation of the Amended Plan is not likely to be followed by liquidation or the need for further reorganization.  *See* Debtor's Plan Projections attached hereto as **Exhibit "2"**, and incorporated herein by reference for all purposes.

###### F.    Non-Acceptance and Cramdown.

Pursuant to § 1129(b), the Bankruptcy Court may confirm the Amended Plan despite the non-acceptance of the Amended Plan by an Impaired Class.  This procedure is commonly referred to as a "cramdown."  Section 1129(b) provides that upon request of the proponent of the Amended Plan, the Bankruptcy Court shall confirm the Amended Plan despite the lack of acceptance by an Impaired Class or Classes if the Bankruptcy Court finds that (a) the Amended Plan does not discriminate unfairly with respect to each non-accepting Impaired Class, (b) the Amended Plan is "fair and equitable" with respect to each non-accepting Impaired Class, (c) at least one Impaired Class has accepted the Amended Plan (without counting acceptances by

insiders), and (d) the Amended Plan satisfies the requirements set forth in § 1129(a) other than § 1129(a)(8).  In general, § 1129(b) permits Confirmation notwithstanding non-acceptance by an Impaired Class if that Class and all more junior Classes are treated in accordance with the "absolute priority" rule, which requires that the dissenting Class be paid in full before a junior Class may receive anything under the Amended Plan.

### 1.      The Plan Is Fair and Equitable.

The Bankruptcy Code establishes different "fair and equitable" tests for holders of Secured Claims, Unsecured Claims and Interests.  As to the dissenting Class, the test sets different standards, depending on the type of Claims or Interests in such Class.

### 2.      Secured Claims.

With respect to a Class of Secured Claims that does not accept the Amended Plan, the Amended Plan Proponents must demonstrate to the Bankruptcy Court that either (i) the holders of such Secured Claims will retain the liens securing such Claims and will receive on account of such Claim deferred Cash payments totaling at least the Allowed amount of such Claim, of a value, as of the Effective Date, of at least the value of such holder's interest in such property, or (ii) the holders of such Claims will realize the indubitable equivalent of such Claims under the Amended Plan.

### 3.      General Unsecured Claims.

With respect to a Class of General Unsecured Claims that does not accept the Amended Plan, the Amended Plan Proponents must demonstrate to the Bankruptcy Court that either (i) each holder of a General Unsecured Claim of the dissenting Class receives or retains under the Amended Plan property of a value equal to the Allowed amount of its General Unsecured Claim or (ii) the holders of Claims or Interests that are junior to the Claims of the holders of such General Unsecured Claims will not receive or retain any property under the Amended Plan.

### 4.      Interests.

With respect to a Class of Interests that does not accept the Amended Plan, the Amended Plan Proponents must demonstrate to the Bankruptcy Court that (i) each holder of an Interest of the dissenting Class receives or retains on account of such Interest property of a value equal to the greatest of the Allowed amount of any fixed liquidation preference to which such holder is entitled, any fixed redemption price to which such holder is entitled or the value of such Interest or (ii) the holders of any Interest that is junior to the Interests of such Class will not receive or retain any property under the Amended Plan.  The Plan Proponents believe that the Amended Plan is fair and equitable with respect to each Class of Claims treated therein.

### 5.      No Unfair Discrimination.

A Plan "does not discriminate unfairly" with respect to a nonaccepting Class if the value of the Cash and securities to be distributed to the nonaccepting Class is equal or otherwise fair

when compared to the value of Distributions to other Classes whose legal rights are the same as those of the non-accepting Class. Since all similarly situated holders of Claims or Interests are classified together and all Claims or Interests in a given Class are treated identically, the Amended Plan Proponents believe the Amended Plan does not unfairly discriminate against any Class.

### G.    Confirmation Hearing.

Section 1128(a) requires the Bankruptcy Court, after notice, to hold a Confirmation Hearing. Section 1128(b) provides that any party in interest may object to Confirmation of a Plan. Notice of the Confirmation Hearing will be provided to all holders of Claims and Interests and other parties in interest (the "Confirmation Notice"). The Confirmation Hearing may be adjourned from time to time by the Bankruptcy Court without further notice except for an announcement of the adjourned date made at the Confirmation Hearing or any adjournment thereof. Objections to Confirmation of the Amended Plan must be made in writing, specifying in detail the name and address of the person or Entity objecting, the grounds for the objection, and the nature and amount of the Claim or Interest held by the objector. Objections must be Filed with the Bankruptcy Court, together with proof of service, and served upon the parties so designated in the Confirmation Notice, on or before the time and date designated in the Confirmation Notice as being the last date for serving and filing objections to Confirmation of the Amended Plan. Objections to Confirmation of the Amended Plan are governed by Bankruptcy Rule 9014 and the local rules of the Bankruptcy Court.

### VIII.   ALTERNATIVES TO CONFIRMATION OF THE PLAN

If the Amended Plan is not confirmed by the Bankruptcy Court and consummated, the alternatives to the Amended Plan include (a) the liquidation of the Debtor under Chapter 7 or (b) an alternative Plan under Chapter 11.

### A.    Liquidation Under Chapter 7.

If the Amended Plan cannot be confirmed, the case may be converted to cases under Chapter 7. In that event, a trustee would be appointed to liquidate the assets of the Debtor for distribution to holders of Claims and Interests in accordance with the priorities established by the Bankruptcy Code. As more fully demonstrated in the Liquidation Analysis, the Amended Plan Proponents believe that Confirmation of the Amended Plan will provide each holder of a Claim entitled to receive a Distribution under the Amended Plan with a recovery that is not less than it would receive if the Debtor was liquidated under Chapter 7.

### B.    Alternative Plan.

If the Amended Plan is not confirmed, the Debtor (or if the Debtor's exclusive period in which to file a plan of reorganization has expired, any other party in interest) may be entitled to file a different plan. Such a plan might involve either a reorganization and continuation of the Debtor's businesses or an orderly liquidation of their assets under Chapter 11 of the Bankruptcy

Code.

## IX.   FEDERAL INCOME TAX CONSEQUENCES

The federal income tax consequences of the Amended Plan to a Creditor will depend upon several factors, including but not limited to: (i) whether the Creditor's Claim (or portion thereof) constitutes a Claim for principal or interest; (ii) the type of consideration received by the Creditor in exchange for the Claim; (iii) whether the Creditor is a resident of the United States for tax purposes (or falls into any of the special classes of taxpayers excluded from this discussion as noted above); (iv) whether the Creditor has taken a bad debt deduction or worthless security deduction with respect to his Claim; and (v) whether the Creditor receives Distributions under the Amended Plan in more than one taxable year.

ALL CREDITORS AND HOLDERS OF INTERESTS IN THE DEBTORS ARE STRONGLY URGED TO CONSULT WITH THEIR OWN TAX ADVISORS REGARDING THE TAX CONSEQUENCES OF THE PLAN THAT ARE RELEVANT TO THEIR PARTICULAR CIRCUMSTANCES.

## X.   AVOIDANCE ACTIONS

Sections 547 and 548 of the Code prohibit certain payments and transfers of property during varying periods and prior to the commencement of a bankruptcy case.  Section 547 deals with preferences and § 548 deals with fraudulent transfers.

Generally, a "preference" is a payment made by an insolvent debtor to a creditor, or for the benefit of a creditor, within ninety days of the date of filing of a case, (the "reach back period") under any chapter of the Bankruptcy Code as a result of which the creditor receives more than it would if the debtor had filed the case as a liquidating bankruptcy under Chapter 7 of the Code.  Under § 547 of the Code, a debtor is presumed to be insolvent during the ninety days preceding the filing of the case.  A "reach back period" of one year is applicable to payments made to insiders of the debtor.  An insider of an individual debtor, such as Lawrence J. Wedekind, includes, but is not limited to, relatives, partners and corporations controlled by the Debtor. Excluded from the types of payments which are prohibited transactions under § 547 are those payments made to creditors in a bankruptcy case for the purpose of placing the debtor's assets beyond the reach of creditors.  Also, transfers for no, or for grossly disproportionate consideration, made while the debtor is insolvent, or as a result of which the debtor becomes insolvent, are fraudulent transfers.

Under § 101(50) of the Code, a "transfer" is defined to mean:

[E]very mode, direct or indirect, absolute or conditional, voluntary or involuntary, or disposing of or parting with property or with an interest in property, including retention of title as a security interest and foreclosure of the debtor's equity of redemption.

Both preferences and fraudulent transfers are prohibited transactions and may be set

aside.  In the event such prohibited transactions are set aside, the person or entity to which the prohibited transfer or payment was made must return to the Debtor or to the Debtor's estate, the money or property received.  Failure to return such money or property may result in the payee or transferee's claim against the Debtor being disallowed and appropriate orders or writs being issued for the seizure of the property or the recovery of the money.

The Debtor discloses the following significant transactions made in the year preceding the filing of this case for the purpose of determining whether any of such transactions constitute preferences or fraudulent transfers.

Larry J. Wedekind sold stock he owned in Integranet Physician Resources, Inc. in a transaction that closed on November 12, 2008.  The proceeds of the sale of such stock were distributed as follows:

| DATE | USAGE OF FUNDS FROM INTEGRANET STOCK SALE | |
|---|---|---|
| | **SOURCE OF FUNDS** | |
| 11/12/2008 | Sales Proceeds | $450,000 |
| | **USAGE OF FUNDS** | |
| 11/13/2008 | Payments to investors of IntegraNet for stock | $140,000.00 |
| 11/19/2008 | Payment to Omni Bank for Payoff of Loan | $124,430.35 |
| 11/19/2008 | Cash Received by Lawrence J. Wedekind | $ 40,000.00 |
| 12/16/2008 | Cashiers Chk for payment of DMH Debt | $ 15,000.00 |
| 12/16/2008 | Cashiers Chk to DMH for payment of DMH Debt | $ 8,400.00 |
| 12/16/2008 | Transfer to personal account Lawrence J. Wedekind at Green Bank, and then transferred to Mr. Wedekind's personal account at Wells Fargo | $120,430.35 |
| | **TOTAL USAGE OF FUNDS** | $448,260.70 |
| | **NET FUND BALANCE** | $ 1,739.30 |

* Note that these funds were already due to Mr. Wedekind from his employer as a bonus, which he waived in exchange for receiving such funds.

Any creditor or party-in-interest who wishes to see the bank statements and transaction documents regarding the source and use of the said funds may make a request to the undersigned counsel for Debtor.

The approximate $120,430.35 transferred into Mr. Wedekind's personal account at Wells Fargo was used as follows:

| Date | Description | Amount |
|------|-------------|--------|
| 02/05/09 | Bartholet Furniture - new furniture purchase | $ 9,016.09 |
| 02/13/09 | Vacation Trip | $ 15,500.00 |
| 02/13/09 | Automobile for son for college | $ 11,000.00 |
| 02/13/09 | Cash - savings | $ 12,000.00 |
| 12/23/08 | Presidential Plus Master Card | $ 19,000.00 |
| 12/23/08 | Chase Credit Card | $ 5,000.00 |
| 12/14/08 | Oppenheimer Fund 529 plan for Son's Education | $ 12,000.00 |
| 12/08/08 | Purchase of Gift for Wife | $ 5,000.00 |
| 12/10/08 | Miller & Associate (representing older son, David) | $ 2,000.00 |
| 01/23/09 | Other credit card payments | $ 11,500.00 |
| 01/09/09 | Purchase of Gift for wife | $ 13,500.00 |
| 01/09/09 | David Livingston (investment) | $ 5,000.00 |
| | Total | $120,516.09 |

Rather than pursue such claims as preferences or fraudulent conveyances, the Debtor has committed, at a minimum, approximately $900,000.00 of his future exempt personal services income which more than reimburses the Debtor's Bankruptcy Estate by a substantial factor.

## XI.    DISCLOSURE STATEMENT DISCLAIMER

### A.    The Debtor has No Duty to Update.

The statements contained in this Disclosure Statement are made by the Debtor as of the date hereof, unless otherwise specified herein, and the delivery of this Disclosure Statement after that date does not imply that there has been no change in the information set forth herein since that date.  The Debtor has no duty to update this Disclosure Statement unless otherwise ordered to do so by the Bankruptcy Court.

### B.    No Representations Outside the Disclosure Statement Are Authorized.

No representations concerning or related to the Debtor, its chapter 11 case, or the Amended Plan are authorized by the Bankruptcy Court or the Bankruptcy Code, other than as set forth in this Disclosure Statement.  Any representations or inducements made to secure your acceptance, or rejection, of the Amended Plan that are other than as contained in, or included with, this Disclosure Statement should not be relied upon by you in arriving at your decision. You should promptly report unauthorized representations or inducements to Debtor's counsel or the Office of the United States Trustee.

**C.      All Information Was Provided By Debtor and Was Relied Upon By Professionals.**

Counsel for Debtor has relied upon information provided by the Debtor in connection with the preparation of this Disclosure Statement.   Although counsel for the Debtor has performed certain limited due diligence in connection with preparing this Disclosure Statement, he has not verified independently the information contained herein.

**D.      No Legal or Tax Advice Is Provided To You By This Disclosure Statement.**

The contents of this Disclosure Statement should not be construed as legal, business or tax advice.   Each creditor or holder of an Interest should consult his, her, or its own legal counsel and accountant as to legal, tax and other matters concerning his, her, or its Claim or Interest.

This Disclosure Statement is not legal advice to you. This Disclosure Statement may not be relied upon for any purpose other than to determine how to vote on the Amended Plan or object to confirmation of the Amended Plan.

**E.      No Admission Made.**

Nothing contained herein shall constitute an admission of any fact or liability by any party (including, without limitation, the Debtor) or be deemed evidence of the tax or other legal effects of the Amended Plan on the Debtor or on holders of Claims or Interests.

**F.      No Regulatory Agency Approval.**

No governmental or other regulatory agency approvals have been obtained as of the date of the mailing of the Amended Plan and Disclosure Statement.   Please note, however, that such approvals are a condition to the Amended Plan's Effective Date.

**XII.     CONCLUSION AND RECOMMENDATION**

The Debtor and its principals believe that Confirmation of the Amended Plan is desirable and in the best interests of all holders of Claims and Interests.   The Plan Proponents therefore urge you to vote to accept the Amended Plan and to evidence such acceptance by returning the Ballot(s) so they will be <u>received</u> by the Balloting Deadline as set forth in section VII-A-10 above.

Date: January 18, 2010

*/s/Lawrence J. Wedekind*

**OF COUNSEL:**
Leonard H. Simon, Esq., Lead Counsel
TBA: 18387400; SDOT: 8200
PENDERGRAFT & SIMON, L.L.P.
The Riviana Building
2777 Allen Parkway, Suite 800
Houston, Texas 77019
(713) 528-8555 (Telephone)
(713) 253-2810 (Mobile)
(832) 202-2810 (Telecopy)
Email: lsimon@pendergraftsimon.com
**PROPOSED ATTORNEYS IN CHARGE FOR DEBTOR**