UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION


IN RE:                          )    CASE NO:  09-32057-H4-11
                                )
                                )         Houston, Texas
LAWRENCE J. WEDEKIND,           )
                                )     Tuesday, March 16, 2010
                                )
          Debtor.              )    (1:48 p.m. to 2:36 p.m.)
_____)    (3:25 p.m. to 3:37 p.m.)


HEARING RE:

#104 - SHOW CAUSE HEARING;
#120 - EXAMINE AND FORFEIT FEES

BEFORE THE HONORABLE JEFF BOHM,
UNITED STATES BANKRUPTCY JUDGE


Appearances:              See next page

Court Recorder:           Paula Crawford

Courtroom Deputy:         Evangeline Attaway

Transcribed by:           Exceptional Reporting Services, Inc
                          14493 South Padre Island Drive
                          Suite A-400
                          Corpus Christi, TX 78418-5940
                          361 949-2988


Proceedings recorded by electronic sound recording;
transcript produced by transcription service.

2

<u>APPEARANCES FOR:</u>

James R. Clark:          MYNDE S. EISEN, ESQ.
                         9800 Pagewood, Suite 3202
                         Houston, Texas 77042

U.S. Trustee:            STEPHEN D. STATHAM, ESQ.
                         Office of the U.S. Trustee
                         515 Rusk, Suite 3516
                         Houston, Texas 77002

3

<u>INDEX</u>

| <u>WITNESS TESTIMONY</u> | <u>DIRECT</u> | <u>CROSS</u> | <u>REDIRECT</u> | <u>RECROSS</u> |
|---|---|---|---|---|
| JAMES CLARK | | | | |
|   BY THE COURT | 7 | | | |
|   BY MR. STATHAM | | 33 | | |
|   BY MS. EISEN | | 37 | | |

| <u>RESPONDENT'S EXHIBITS</u> | | <u>RECEIVED</u> |
|---|---|---|
| 1 | | 14 |
| 2 | | 17 |

| <u>COURT'S EXHIBITS</u> | | <u>RECEIVED</u> |
|---|---|---|
| A THROUGH M | | 17 |

| <u>ARGUMENT</u> | |
|---|---|
| BY MR. STATHAM | 38 |
| BY MS. EISEN | 39 |

| <u>COURT'S RULING</u> | <u>DEFERRED</u> |
|---|---|

4

1          **Houston, Texas; Tuesday, March 16, 2010; 1:48 p.m.**

2                          **(Call to Order)**

3          **THE COURT:**  Okay.  Let's go to the Wedekind case.

4     This is Case Number 09-32057.  This is the Chapter 11 case of

5     Lawrence J. Wedekind, W-e-d-e-k-i-n-d.  We've got two matters

6     set today.  Docket 104 is my Show Cause Hearing requiring James

7     R. Clark to appear and show cause why he should not be

8     sanctioned for his conduct in this case and we also have Docket

9     120 which is a motion of the United States Trustee to examine

10    and forfeit fees and for injunctive relief.

11         Let me go ahead and get appearances, please, for

12    Counsel.

13         **MR. STATHAM:**  Good afternoon, your Honor.  Steve

14    Statham for the United States Trustee.

15         **THE COURT:**  Thanks.

16         **MS. EISEN:**  Mynde, M-y-n-d-e, Eisen, E-i-s-e-n, for

17    James R. Clark.

18         **THE COURT:**  Thanks, Ms. Eisen.  Okay.  I've got -- it

19    looks exhibits from Mr. Statham on behalf of the U.S. Trustee,

20    Exhibits 1, 2, 3, 4, 5, 6, 7 and 8.  Ms. Eisen, have you had an

21    opportunity to look at these?

22         **MS. EISEN:**  Yes.  Mr. Statham was nice enough to

23    shoot them over to me yesterday, your Honor, and I reviewed

24    them.

25         **THE COURT:**  Okay.

1          **MS. EISEN:**  We have no objection to them.

2    Mr. Statham and I have had -- and my client have had numerous

3    discussions during the last couple of weeks regarding possible

4    sanctions and recommendations and Mr. Statham has made a

5    recommendation sanction to us of basically -- as you know, my

6    client has remitted the retainer to Mr. Simon and he is willing

7    -- and Mr. Statham suggested that he forego any fees for any of

8    the work he did which is approximately $25,000, your Honor, and

9    a agreement not to practice in this Court as a sanction and in

10   response to the injunction thing not to step on the toes of the

11   Court in his -- in their show cause order.  My client has

12   agreed to those sanctions and is willing to enter into any

13   agreement to those effects subject to this Court approval and

14   this Court taking any further testimony if this Court feels he

15   needs.

16          My client is remorse and realizes that he had made a

17   mistake and he did wrong.  He certainly had no criminal intent

18   when he did it and he went to great lengths to comply with the

19   Court's order and got it in by the court date.

20          **THE COURT:**  Let me ask.  When you say to practice in

21   this court, do you mean my particular court or are you talking

22   Southern District of Texas?

23          **MS. EISEN:**  The suggestion was -- I believe it was

24   this Court, was it not, Mr. Statham?

25          **MR. STATHAM:**  Right.

1          **THE COURT:**  Okay.

2          **MS. EISEN:**  If it's the Southern District, I believe

3    that my client would probably be willing to do that as well --

4          **THE COURT:**  Okay.

5          **MS. EISEN:**  -- but, you know, Mr. Statham had made

6    the proposal to us.

7          **THE COURT:**  Okay.  Let's see.  Mr. Statham, based

8    upon what Ms. Eisen has told me, do you want to examine

9    Mr. Clark?

10          **MR. STATHAM:**  Well, I -- here's our situation.  I

11    can't compromise or settle the Court's Show Cause Hearing.

12          **THE COURT:**  Right.

13          **MR. STATHAM:**  That was the basis for the U.S. Trustee

14    motion to, kind of, give us some footwork that we could reach

15    on.  I think the Court's probably got to have evidence or

16    testimony to satisfy the show cause unless you're prepared as

17    the Court to accept the U.S. Trustee proposal as the Court's

18    result.  I don't know if you are or you're not and I can't

19    suggest that one way or the other.

20          **THE COURT:**  I think I've got to hear testimony.  I

21    think even if I didn't have my own show cause or not, I think I

22    need to have testimony even if you were asking me solely on

23    your motion to approve.

24          **MR. STATHAM:**  I think my motion -- or my results need

25    to be a component of the Show Cause Order.  That's where I'm

1   at.

2           **THE COURT:**  I agree.  Okay.  Let's do this.  Let's

3   have Mr. Clark come forward and be sworn in.  I have some

4   exhibits that I want him to look at.  They're all of record.

5   These are all pleadings and both Ms. Eisen and Mr. Statham,

6   you're welcome if you need to stand next to Mr. Clark while I

7   go through questions I have and then both of you certainly can

8   follow up on the questions that I have.  So why don't we have

9   Mr. Clark come forward?  He can -- Ms. Attaway will swear him

10  in.

11          **THE CLERK:**  Please raise your right hand.

12                  **JAMES RUSSELL CLARK, SWORN**

13          **THE COURT:**  Vangie, would you give Mr. Clark those

14  exhibits?  Thanks.

15                      **COURT EXAMINATION**

16  **BY THE COURT:**

17  Q   Mr. Clark, could I have you state your full name for the

18  record and spell your last name?

19  **A**   Yes, your Honor.  My name is James Russell Clark,

20  C-l-a-r-k.

21          **THE COURT:**  Thanks.  I have handed you what we've

22  marked as Court Exhibits A through M, as in Mary, and I'd like

23  to ask you some questions.  Court Exhibit Number A is the

24  Docket Sheet and, Ms. Eisen, you can approach and look at the

25  exhibits with him.

1          **MS. EISEN:**  Yes, your Honor.  Since I was not Counsel

2  in this case --

3          **THE COURT:**  No, that's fine.  That's fine.  I'm happy

4  to have you be there.  Mr. Statham, you have the same -- the

5  same thing applies if you want to look at these exhibits.

6          **MR. STATHAM:**  Thank you, sir.

7  **BY THE COURT:**

8  Q    Mr. Clark, on the Docket Sheet, it shows that Mr. Wedekind

9  is represented initially by you as James R. Clark of James R.

10  Clark & Associates.  Do you see where I'm reading?

11  A    Yes, I do, your Honor.

12  Q    Okay.  Mr. Clark, in the Court Exhibit B, which is the

13  Application to Employ Attorney, on Paragraph 3 it says the

14  applicant, meaning the Debtor, desires to employ James R. Clark

15  with the firm of Clark & Keiter, P.C.  Do you see where I'm

16  reading?

17  A    Yes, I do, your Honor.

18  Q    And my question is, which is it.  Is it your own firm or

19  when you took on the representation, were you a partner at

20  Clark & Keiter, P.C.?

21  **A**    Your Honor, as perhaps the Court is aware, Mr. Keiter had

22  a problem with the State Bar of Texas.  Even though he could

23  practice in the State Courts, he was not allowed to practice in

24  the Federal Courts.  So we formed Clark & Keiter and -- but --

25  and then following that, Mr. Keiter had other problems and so

Clark - Court Examination                    9

1  since then, I've been practicing as I have since 1987 as James

2  R. Clark & Associates, P.C.

3  **Q**    So when you took on the representation of Mr. Wedekind,

4  you were taking it on as James R. Clark & Associates?

5  **A**         Well, actually it came -- at that time we were

6  operating as Clark & Keiter and we operated as Clark & Keiter

7  until -- and I'm not sure exactly what the timeframe was, your

8  Honor, when he was no longer -- had a license.  As I'm sure the

9  Court's aware, he does not have a license now.

10 **Q**    Well, I only know -- I was reading -- I read the Texas Bar

11 Journal every month and I try to read it entirely and I noticed

12 that Mr. -- according to -- I guess this is the March 2010 of

13 the Texas Bar Journal, it says that

14 Mr. Keiter resigned on November 4th, 2009.

15 **A**    That's correct, your Honor.

16         **THE COURT:**  Which I was unaware of until I read this.

17 So let me go back then.

18 Q    When the application was done, did Mr. Wedekind -- did you

19 tell him that the firm that was representing him was Clark &

20 Keiter, P.C. or did you tell him the firm that was representing

21 him was James R. Clark & Associates?

22 **A**    It probably was Clark & Keiter, your Honor, because at

23 that point in time Mr. Wedekind had been a client of

24 Mr. Keiter's prior to the filing of this bankruptcy.

25 Mr. Keiter had done a great deal of work.  Perhaps the Court's

1  aware that Mr. Wedekind was the general partner in a limited

2  partnership that owned Jefferson Memorial Hospital in Jasper

3  and we filed for that.

4  Q    Okay.  Was Mr. Wedekind aware of any problems that

5  Mr. Keiter had professionally in terms of complaints that had

6  been filed against him or grievances or any kind of reprimands

7  or --

8  A    Yes.  It's my understanding there was a full disclosure of

9  that and Mr. Wedekind has been aware of it from the very

10  beginning.

11  Q    Okay.  Let's see.  The 30,000-dollar retainer that was set

12  forth or disclosed in the Application to Employ, was that

13  retainer made out to Clark & Keiter, P.C. or to James R. Clark

14  & Associates?

15  A    Your Honor, I'm not sure.

16  Q    Okay.

17  A    I can't honestly answer that question.

18  Q    Okay.

19  A    It's been a long time ago.

20  Q    When the $30,000 was taken in, I was trying to figure out

21  why you have a disclosure made on April 21, 2009 which is Court

22  Exhibit C and then on Court Exhibit D we've got an Amended

23  Disclosure of Compensation.  Can you tell me why you amended?

24  A    Are you referring to A and D, your Honor?

25  Q    I'm referring to Court Exhibit C and Court Exhibit D.

1    Court Exhibit C on the right-hand side --

2    **A**    Oh, I'm sorry.  I've got --

3    Q    -- has Exhibit A marked.  That was based upon what was on

4    the Docket Sheet.  I think it's an exhibit to a -- the

5    application maybe.  To try to be more specific, Court Exhibit C

6    was filed -- and Document 15-1 was filed on April 21, 2009.

7    Court Exhibit D, as in David, is Document 20-2 and was filed on

8    April 30, 2009 and I'm trying to figure out why you amended.

9    **A**    I think, your Honor, there's a difference in the source of

10   the compensation.  Exhibit C, it says the source of the money

11   was Integrinet (phonetic) Physician Organization and the

12   amended one on 4/30 was Integrinet Physician Resources, Inc.

13   Q    So it's a different entity that actually paid the

14   retainer?

15   **A**    That's my understanding, your Honor, yes.

16   Q    And is that a -- was that an entity that Mr. Wedekind

17   owned or controlled?

18   **A**    That is correct, your Honor.

19   Q    Okay.  When the $30,000 came in, did you view it as -- was

20   it put in a trust account or --

21   **A**    It was not put in a trust account, your Honor.  It was put

22   in the operating account of James R. Clark & Associates, P.C.

23   Q    Should it have been put in a trust account?

24   **A**    Absolutely it should.

25   Q    Okay.  Tell me why it wasn't.

1  **A**    At that particular time, your Honor, I needed funds to

2  operate.

3  Q    And when you say you needed funds to operate, you needed

4  funds to operate your firm or did you use the funds for

5  something other than firm issues?

6  **A**    It was used for firm only plus compensation to myself.

7  Q    As I understand from previous representations that you

8  gave me, you did not disclose to

9  Mr. Wedekind that the money was -- that you used the money,

10  true?

11  **A**    That is correct, your Honor.

12  Q    Okay.  When you say the funds should have put in the

13  firm's trust account, tell me why you believe it should have

14  been -- the money should have been in the firm's trust account.

15  **A**    Because that's what the Rules require, your Honor.

16  Q    Did you -- how did you view the retainer, as a retainer

17  that once you performed services, filed a fee application and

18  obtained Court approval, you would then draw it down?

19  **A**    That's what should have been done, your Honor, and what

20  obviously I had intended to do was after the completion of my

21  representation was to file a fee application hopefully that the

22  Court would approve it.

23  Q    If you had done $40,000 worth of work, would you have

24  submitted a fee application for $40,000 and sought approval to

25  draw down to 30 and then look to

1  Mr. Wedekind for the additional ten?

2  A    Yes, I would have.

3  Q    Have you ever done this in any other case in which you've

4  represented a Debtor?

5  A    Yes, I have.

6  Q    Okay.  How many times?

7  A    I have no idea, your Honor.

8  Q    Has it been your --

9  A    It has been my general practice if

10 that's --

11 Q    That's my question.

12 A    Yes, it is, your Honor.

13 Q    And did you understand that what you were doing was

14 improper?

15 A    Yes, I did.

16 Q    Did any -- is this the first time that anyone has ever

17 brought it -- raised it in the court?

18 A    Absolutely.

19 Q    Okay.  Do you in the ordinary course of your business send

20 monthly invoices to clients?

21 A    Your Honor, normally my practice -- in addition to

22 bankruptcy practice, I do criminal defense work and I do family

23 law and with those, I usually get a fixed fee in advance of any

24 work that I do.

25 Q    And so, like with Mr. Wedekind, I think I heard Ms. Eisen

Clark - Court Examination                      14

1    say at the beginning of the hearing that you had done

2    approximately $25,000 worth of work.

3    **A**    That is correct, your Honor.

4    Q    Did you send him invoices that total up to 25,000?

5    **A**    I have a -- if it please the Court,

6    we'll --

7              **THE COURT:**  All right, please.  You can give it to

8    Ms. Attaway.

9              Okay.  So let's see.  Why don't we call this

10   Respondent Exhibit 1?  Mr. Statham?

11             **THE WITNESS:**  Yes, your Honor.

12             **THE COURT:**  Any objection to my admitting?

13             **MR. STATHAM:**  No, sir.

14        **(Respondent's Exhibit Number 1 was received in evidence)**

15   **BY THE COURT:**

16   Q    Okay.  And are -- if you had filed a fee application in

17   this court, is this the attachment that you would have

18   submitted saying this is what I did?

19   **A**    It would have been exactly this attachment, your Honor,

20   and also it includes postage and copy fees and the normal

21   things that we always submit in a fee app, yes, sir.

22   Q    But this is not something that you sent to Mr. Wedekind on

23   a monthly basis?

24   **A**    I did not.

25   Q    Okay.  Did he ever ask for any invoices?

1   **A**    No.

2   Q    Okay.  In your standard practice ordinary course of

3   business with respect to representation of Debtors in

4   bankruptcy, then do I understand you did not or have not

5   routinely sent out monthly invoices?

6   **A**    That is correct, your Honor.

7   Q    Okay.  The money that was paid -- the 30,000, let's start

8   with that -- there's no question a thousand 41 was used to pay

9   the filing fee?

10  **A**    I'm sorry.  I didn't understand.

11  Q    I said, of the $30,000 that came in, there's no question

12  in your mind, is there, that a thousand 39 was used to pay the

13  filing fee for the petition?

14  **A**    That is correct, your Honor.

15  Q    Okay.  And so it was the remaining amount that was spent?

16  **A**    That is correct.

17  Q    Did Mr. Keiter get any of the remaining amount?

18  **A**    Yes, he did.

19  Q    How much did he get?

20  **A**    Your Honor, our agreement was on any fee that we received,

21  Mr. Keiter and I split the work.  He did primarily all of the

22  office work.  I made all the court appearances and our

23  agreement was that he receive 65 percent.  I receive 35

24  percent.

25          **THE COURT:**  So of the -- get my calculator out.

Clark - Court Examination                                    16

1  Q    Of the 28,961, if you got 35 percent -- in other words,

2  you received 10,136.35?

3  **A**    Correct.

4  Q    And he received -- well, if I do the calculation --

5  $18,824 and some change.

6  **A**    If I may, your Honor.  I don't mean to interrupt.  There's

7  also a question concerning an additional $2,500.

8  Q    I'll get to that.

9  **A**    Oh, okay.

10 Q    Yeah.  So of the 28,961, Mr. Keiter received, roughly,

11 18,824.  You received, you know, roughly, 10,000 plus?

12 **A**    That is correct.

13 Q    Okay.  Now, on the 2,500 that was paid postpetition, same

14 arrangement?

15 **A**    Yes, your Honor, but that -- as I stated at the date of

16 the hearing, that $2,500 came from one of his -- one of

17 Mr. Wedekind's partnerships called Integrinet and it was

18 unrelated to the bankruptcy because Mr. Keiter over the last

19 several years has done a tremendous amount of work for

20 Mr. Wedekind concerning his various entities.  So -- and I have

21 a copy of that check, your Honor, from Integrinet.  So it

22 really was unrelated to this bankruptcy.

23       **THE COURT:**  Okay.  If we've got a copy of that, let's

24 make it an exhibit.

25       **MS. EISEN:**  I have one copy, your Honor.  I'll pass

Clark - Court Examination                    17

1    it up.

2              THE COURT:  Sure.  Mr. Statham, any objection to my

3    admitting Respondent Exhibit 2?

4              MR. STATHAM:  No, sir.

5              THE COURT:  Okay.  Then it's admitted.

6         (Respondent's Exhibit Number 2 was received in evidence)

7              So the record's clear, I've also admitted Respondent

8    Exhibit 1 in addition to -- I also make note that I now admit

9    the eight exhibits of U.S. Trustee --

10             MR. STATHAM:  Thank you.

11             THE COURT:  -- and as I've said, I've Court Exhibits

12   A through M, as in Mary, which I'll admit as well.

13        (Court Exhibits A through M were received in evidence)

14             Let me keep going here then.

15   BY THE COURT:

16   Q    Mr. Clark, do you understand -- well, what is your

17   understanding today sitting here?  Do you believe that the law

18   requires you to disclose the $2,500 to this Court?

19   A    Your Honor, under my interpretation since it did not come

20   from the Debtor himself -- it came from a general partnership

21   of his for nonrelated bankruptcy work.  It was my understanding

22   that I did not have to disclose it because it would have been

23   as if he'd, you know, had a traffic ticket or he has a son

24   that's had some problems of a criminal nature or something of

25   that.  So in my mind it was totally unrelated.  That's why it

Clark - Court Examination                    18

1   was not reported.  There was certainly no intent to circumvent

2   the Court on that.

3   Q    All right.  Let me go back for a minute to the split, the

4   65/35 you had with Mr. Keiter.  Did you make disclosure of that

5   agreement to the Court?

6   **A**    No.

7   Q    Was the disclosure of that agreement made to Mr. Wedekind?

8   **A**    I have no idea, your Honor, because --

9   Q    You didn't make the disclosure?

10  **A**    I did not.  No, I did not.

11  Q    Does your firm -- let me break it up.  Does James R. Clark

12  & Associates have a trust account?

13  **A**    Yes, it does, your Honor.  We have an IOLTA account.

14  Q    When do you put client funds in there?  Is it only in your

15  criminal cases?

16  **A**    I use that trust account very, very seldom, your Honor.

17  I've had a 33-dollar and 34-cent balance in it for months and

18  months and months and months because I don't have that type of

19  practice other than bankruptcy where, in my opinion, it would

20  be required to deposit into my IOLTA account but I have always

21  had one.

22  Q    Okay.  I recollect you said you do bankruptcy, family law

23  and criminal law?

24  **A**    That is correct.

25  Q    On the criminal matters you take, what is your typical

 1  agreement that --

 2  **A**     I have them sign a contract and it outlines exactly what

 3  my services are, whatever the complaint or indictment or

 4  whatever and it's a flat-fee arrangement that says that it

 5  includes trial, appeal, whatever.  It's just a flat fee.

 6  Q     So if I come to you and say, I've been indicted by the

 7  U.S. Attorney for burglary, you know, embezzlement in a bank --

 8  **A**     Right.

 9  Q     -- you say to me, here's a contract.  Sign it and the flat

10  fee is, hypothetically, a hundred thousand bucks.

11  **A**     Correct.

12  Q     And the minute I give you that hundred thousand, it's your

13  understanding you've earned it because you're deal with me is

14  whether you try it right on up and appeal it in the Supreme

15  Court of the United States or you settle it with my approval

16  next week, you get the hundred thousand from the minute I give

17  it to you?

18  **A**     That is correct, your Honor, because I emphasize that it

19  is a flat fee.  They know exactly what it's going to cost them,

20  unlike some attorneys who practice criminal law.  They'll say,

21  well, I'm going to charge you X-number of dollars and then I'm

22  going to charge you X-number of dollars every time I appear in

23  court.  Well, I'm sure the Court is aware, you can reset,

24  reset, reset and do all of that.  So I emphasize it is a one-

25  time, flat-fee arrangement.

1   Q    And it does not matter whether you do ten hours work --

2   let's say -- go back to the hundred thousand hypothetically.

3   It does not matter whether you do ten hours work and resolve it

4   to the client's satisfaction or a thousand hours' worth of

5   work, you still get the hundred thousand?

6   **A**    That is correct.  It's -- they understand that they pay

7   for results and the results obviously are to get it dismissed

8   or whatever the minimum is that can be arranged or if we go to

9   trial and that's what the contract says that it goes all the

10  way through trial or up on appeal.  So it's a --

11  Q    Do you use the word, I don't know, "nonrefundable" or

12  something like that in the written agreement?

13  **A**    Yes, I do.

14  Q    Let me go over -- I think the other area was family law?

15  **A**    Yes.

16  Q    Same type of arrangement?

17  **A**    Not necessarily.  It depends upon whether it's contested

18  or an uncontested but normally I've been doing it so long that

19  I can anticipate.  I don't always guess right but normally I

20  can -- after interviewing with a client and if they've been

21  served after reading the pleadings, I think I can make a fairly

22  educated guess.

23  Q    So if someone comes to you and says, I want you to

24  represent me in my divorce and custody fight --

25  **A**    Right.

Clark - Court Examination                                    21

1    Q     -- you would assess it based upon your experience and you

2    would say either 50,000 -- you've got to give to me now and it

3    doesn't matter whether I do ten hours of work or a thousand

4    hours of work, that's all you'll ever have to pay me but if I

5    get it done in ten hours, there's no refund?

6    **A**     Not necessarily on a family law matter, your Honor,

7    because so -- a lot of times what is anticipated as to being an

8    uncontested matter -- and I will set a fee for what I estimate

9    the number of hours that would be.  Then when it changes

10   drastically, well, then I explain to the client there's going

11   to be additional hours involved and additional fee involved.

12   Q     So --

13   **A**     I do not have a flat-fee contract for family law matters.

14   Q     So on a family law matter if you can, say, take an up-

15   front of payment of 10,000, say, would you bill against that or

16   would you immediately put it in your operating account on the

17   theory that you've already earned it?

18   **A**     I put it in my operating account.

19   Q     And after you've performed services that equal a value of

20   10,000, then you go back to the client and say, if you want me

21   to continue to represent you, I need additional money?

22   **A**     That is correct.

23   Q     And if they give you the additional money, whatever you

24   ask for -- let's say it's 20,000 because you anticipate a trial

25   is coming up, once again though you use the word

                    Clark - Court Examination                    22

1    "nonrefundable" such that if you end up only spending two hours

2    more because you settle it, you shall keep the 20?

3    **A**    That is correct.

4    Q    Let me then go forward to the bankruptcy.  As I read the

5    pleadings, what you were conveying to me was you took a

6    retainer.  You were going to perform the services and then seek

7    approval for a drawdown?

8    **A**    That is correct.

9    Q    Okay.  But, in fact, that's not what you've been doing in

10   your bankruptcy practice?

11   **A**    I have not been doing that.

12   Q    How many Chapter 11s -- how many years have you been

13   practicing?  Let me ask you.

14   **A**    Forty-two.

15   Q    Out of the 42 years, how many Chapter 11s have you done?

16   **A**    Judge, I have no idea.

17   Q    More than 500?

18   **A**    No, no, no, no.

19   Q    More than 50?

20   A    No.

21   Q    And I'm talking Chapter 11s.  Let's stick with 11s.

22   **A**    Fifty may be a little high because primarily I did -- I

23   did not do 13s.  Most of my practice was 7s.

24   Q    Okay.  When did you start doing 11s?

25   **A**    Probably in 2000, 2001, somewhere along in there.

Clark - Court Examination                    23

1  Q    Have you always been up until your association with

2  Mr. Keiter a sole practitioner?

3  **A**    Yes, your Honor -- well, no, since '87 I have been solo.

4  Prior to that time, I was always with a firm.

5  Q    Let me go back then.  Since, roughly, 2000 Chapter 11s?

6  **A**    That would be, I think, a good guess.

7  Q    Since 2000 then, let's just -- would you estimate

8  somewhere between 20 and 50?

9  **A**    I'd say 20, 22, somewhere along in there.

10 Q    Of the nature of Mr. Wedekind's -- are they individuals or

11 are they businesses as well?

12 **A**    Both.

13 Q    Small business?

14 **A**    Yes.

15 Q    Okay.  So it's really those 20 or 22, however many we're

16 talking about where the standard operating practice has been

17 you took the retainer -- you took the money that they paid you

18 and put it in your operating account and spent it?

19 **A**    That is correct.

20 Q    And in all those other cases, you've done fee

21 applications?

22 **A**    Yes.

23 Q    And gotten them approved?

24 **A**    Yes.

25 Q    Without disclosing this procedure -- your normal practice?

Clark - Court Examination                    24

1   **A**    That is correct.

2   Q    Okay.  Let me go back a minute.  You've been practicing 42

3   years.  History, where did you go to law school?

4   **A**    University of Houston.

5   Q    So you graduated --

6   **A**    In '67.

7   Q    '67.

8   **A**    I was in the service four years.  I got out of the

9   service.  I worked full-time and went to night school nine

10  years.  My first year out of the service I went to Navarro

11  College in Corsicana on a football scholarship and the GI Bill.

12  I started undergrad U of H in '56, got my BBA in '61 and

13  started U of H Law School in '63 and finished in '67.

14  Q    And let's see.  From '67 then through '86, you were with a

15  firm or various firms?

16  **A**    That is correct, your Honor.

17  Q    Which one?

18  **A**    I started out with Stein & Shepley.  Then it was Black,

19  Hebinck, Hargrove and Clark.  The Black was Judge Norman Black.

20  Then it was Clark & Hinojosa and then since then it's been

21  James R. Clark & Associates.

22  Q    Have you ever had a grievance filed -- well, let me go --

23  have you ever been suspended from practicing law?

24  **A**    I'm sorry?

25  Q    Have you ever been suspended from practicing law?

1    **A**    No.

2    Q     Have you ever been reprimanded?

3    **A**    Yes.

4    Q     Public, private or both?

5    **A**    One of each.

6    Q     So you, therefore, have had some grievances filed against

7    you?

8    **A**    Yes, I have.

9    Q     Okay.  The public reprimand, what was it for?

10   **A**    There was a grievance filed against me and I did not file

11   a response.

12   Q     Do you recollect what the nature of the grievance was?

13   **A**    I had represented a Debtor in a bankruptcy and a Chapter 7

14   and there was a question as to whether or not the -- they were

15   divorced.  The divorce -- final divorce decree provided that

16   the husband was to pay the wife X-number of dollars per month

17   and this was before the family code which for -- has spousal

18   maintenance.  So he filed the Chapter 7 and listed that as a

19   debt.  I was not representing the Debtor.  I filed pleadings

20   for the wife and asking that that not be discharged and she was

21   to receive I think it was like $1,800 a month for the rest of

22   her life -- or rest of his life and I did not file a response

23   to it and I got a public reprimand.

24   Q     And then the private reprimand, did it concern a

25   bankruptcy matter?

1   **A**    No.  It was a family law matter.

2   Q    The monthly operating reports, which are exhibits -- Court

Exhibits, oh, G and H and I and J and K -- it looks to me like

3

Mr. Wedekind signed them but I want to make sure you agree with

4

me.

5

6   **A**    Which exhibits?  Is your question, is this his signature,

your Honor?

7

8   Q    Yes.

9   **A**    As far as I know, yes, that is his signature.

10  Q    Let me ask.  Am I right in concluding from looking at the

Docket Sheet that you uploaded these documents from your

11

office?

12

13  **A**    Correct.

14  Q    Do you review -- did you review these operating reports?

15  **A**    No, because they are prepared by Michael Jason who is a

CPA and he's the one who has been employed as the CPA for this

16

bankruptcy.  He prepares them.  We file them.

17

18  Q    Okay.  Let me ask you this.  Does Mr. -- was Mr. Jason

aware that you had spent the 28,961?

19

20  **A**    I have no knowledge, your Honor.

21  Q    Okay.  You haven't spoken with him?

22  **A**    I have since this came up.

23  Q    Let me ask you this.  Have you spoken with him about this

28,961 issue since the hearing -- since the -- since I filed

24

the Show Cause Hearing on the Docket?

25

Clark - Court Examination                                27

1   **A**    Yes, I have.

2   Q    Okay.  And what have you discussed with him?

3   **A**    I just told him exactly what happened, that I did not put

4   it in my trust account and you obviously were concerned about

5   it and ordered me to make a disgorgement within 24 hours, which

6   I did.

7   Q    Do you know if Mr. Jason has spent the retainer he got?

8   **A**    I have no idea, your Honor.

9   Q    I want to look at your -- let me go back to the 2,500 for

10  a minute.  Am I right in saying you had the same 65 percent/35

11  percent split with Mr. Keiter on that money?

12  **A**    We've had that split, your Honor, since January of '08.

13  Q    So in effect then, you didn't get the 2,500.  You got,

14  when that money came in -- if I do my calculator -- $875?

15  **A**    That's correct, your Honor.

16  Q    Okay.  I haven't had a chance to look at Respondent

17  Exhibit 1 which is the description of the services you provided

18  to Mr. Wedekind.  Can you tell me off the top of your head --

19  do you recollect how frequently you met with him during the

20  pendency of the bankruptcy?

21  **A**    It was on a -- I would -- it was on a regular basis, your

22  Honor, because he was in and out of our offices on a regular

23  basis.  Sometimes it would be two or three times a week and

24  then there would be gaps in there but he was a constant,

25  constant visitor -- or appearing in our offices --

Clark - Court Examination                    28

1   Q    Okay.

2   **A**    -- because in addition to this, there were other things

3   that were being done for him by Mr. Keiter.

4   Q    Have you ever been sanctioned by a Court before?

5   **A**    By a what?

6   Q    Sanctioned by a Court.  Has a Court ever imposed sanctions

7   against you?

8   **A**    Yes.

9   Q    Okay.  Tell me how many times.

10  **A**    One time.

11  Q    And who -- which Court?

12  **A**    Judge Steen.

13  Q    Okay.  And what did Judge Steen do?

14  **A**    Mr. Hector Duran and I had agreed to enter an agreed

15  order.  Mr. Duran sent it to me.  I signed it, sent it back.

16  He said that he would appear at the hearing and announce that

17  we had entered into an agreed order and file it with the Court.

18  Therefore, I did not appear and Judge Steen filed a motion for

19  sanctions against me for failure to appear to enter that agreed

20  order.

21  Q    And he then held a hearing?  Did Judge Steen --

22  **A**    Yes.

23  Q    And did you appear?

24  **A**    Yes.  Oh, yes.

25  Q    All right.  And he sanctioned you?

1   **A**    Yes.

2   Q    What type or form of sanction did he --

3   **A**    Five hundred dollars.

4   Q    And it was simply for -- I say simply.  It was for failure

5   to appear.  Was there any other reason?

6   **A**    No.

7   Q    The 28,961 that you put in your operating account, did you

8   spend that money immediately or was it over a period of weeks

9   or months?

10  **A**    No, it would have been over a period of time.  I mean, I

11  didn't draw it down and we didn't -- because I didn't have the

12  need to.  So it was over a period of time and actually, as the

13  Court is aware, I only got, like, $8,100 or something like

14  that.

15  Q    Well, fair enough.  Yeah, if I take the 28,961 and I

16  multiply times 35, the 10,136.  If you got it obviously

17  sometime around when the case was filed, how long did you take

18  to use it up?

19  **A**    Probably three months.

20  Q    Okay.

21  **A**    My expenses are very low.

22  Q    Do you have any associates working at your firm?

23  **A**    I do not.

24  Q    So it's strictly yourself?

25  **A**    Correct.

Clark - Court Examination                                        30

1   Q    Any legal assistants or secretaries?

2   A    What I do is use two part-time paralegals.

3   Q    I've looked at the Plan and Disclosure Statement that were

4   filed when you were Counsel of Record.  Am I right in saying

5   that you drafted those documents?

6   A    No.  Mr. Keiter did.

7   Q    Mr. Keiter did.  Okay.  Did you review them?

8   A    Yes.

9   Q    Did you review them by yourself or with Mr. Wedekind or

10  both?

11  A    No, just by myself.

12  Q    Okay.  Who reviewed them Mr. Wedekind, Mr. Keiter?

13  A    Mr. Keiter, yes.  And probably Mr. Jason.  Mr. Keiter and

14  Mr. Jason.

15  Q    Okay.  When you --

16  A    I was in on some of those meetings but the bulk of the

17  work was done by Mr. Keiter and Mr. Jason.

18  Q    Okay.  And when you reviewed the pleadings, any changes

19  that were made, would you have given them to Mr. Keiter?

20  A    Yes.

21  Q    The application that you did which is Court Exhibit B --

22  A    Yes.

23  Q    -- if I could ask you to look at that.

24  A    Which is it?

25  Q    Court Exhibit B, as in boy.  It's Docket 15.  It's the

1    Application to Employ Attorney for Debtor.  Let me know when

2    you get there.

3    **A**    I have it, your Honor.

4    Q    Okay.  Did you draft that application for Mr. Wedekind to

5    sign?

6    **A**    No.  This is a standard form that we use.  I don't know

7    whether it came off of my computer or

8    Mr. Keiter's.  I really don't know.

9    Q    Okay.  And the --

10    **A**    But it's a standard one, your Honor, that we use.

11    Q    Okay.  And the -- so you've got one on your computer and

12    Mr. Keiter had one on his?

13    **A**    That's correct, your Honor.

14    Q    The affidavit that's attached which you signed, do you see

15    where I'm -- it's Page 4 or 5 to -- it looks like you signed

16    this on April 21, 2009.  Let me make sure

17    you --

18    **A**    Yes.  The -- wait a minute.

19          **MS. EISEN:**  The affidavit should be the next page.

20          **THE WITNESS:**  Oh, the affidavit, yes, I have it.

21    **BY THE COURT:**

22    Q    Did you prepare that?

23    **A**    Yes, I would have prepared that.

24    Q    Okay.  And the order that you submitted with the

25    application -- once again was that an order that you submitted

1   that would have been on your forms -- it would have been one of

2   your forms?

3   **A**     That is correct, your Honor.

4   Q     Okay.  I think that was the last -- maybe the last page of

5   Court Exhibit B.

6   **A**     Yes, I have it.

7   Q     Okay.  Let me go back for a minute.  When were you born?

8   **A**     When?

9   Q     Yes.

10  **A**     May 14th, 1933.  I'm 76 years old.

11  Q     So you served in the armed services four years?

12  **A**     I went in the Navy the 21st of June of '51 and got out the

13  20th of June of '55, four years to the day.

14  Q     Did you serve in Korea?

15  **A**     Yes, I did.

16  Q     In combat?

17  **A**     I was there in '52 and '53.

18  Q     On a ship or --

19  **A**     Yes.

20  Q     Honorably discharged?

21  **A**     Yes.  Plus four years in the Reserves, a total of eight

22  years.

23          **THE COURT:**  Got you.  Let's see if I've got any other

24  questions.  I don't think so.  Mr. Statham, do you have any

25  questions?

1          **MR. STATHAM:**  I do.  May I proceed?

2          **THE COURT:**  Yes.

3                        **CROSS EXAMINATION**

4    **BY MR. STATHAM:**

5    Q    Mr. Clark, so the record is clear, you had an opportunity

6    to seek and consult with Counsel prior to today's hearing,

7    correct?

8    A    I'm sorry.  I'm afraid I didn't hear you.

9    Q    Forgive me.  You have an opportunity to meet and consult

10   with Counsel prior to today's hearing?  In other words, you had

11   a chance to talk to a lawyer?

12   A    Yes, I did.  I'm sorry.  My hearing is not perfect.

13   Q    In fact, you brought your Counsel with you today?

14   A    I did.

15   Q    U. S. Trustee Exhibit 5 is the Order for Withdrawal and

16   Substitution of Counsel and for Approval of Employment and

17   that's in the exhibit book that Ms. Eisen's got for you right

18   there.

19   A    Exhibit 5?

20   Q    Yes, sir.

21   A    Yes, I have it.

22   Q    And if you'll look at Exhibit 5, Page 2, that's the

23   interlineation that the Court made directing you to --

24   A    Yes.

25   Q    -- disgorge the money that you had received from

Clark - Cross / By Mr. Statham                     34

1    Mr. Wedekind?

2    A    That is correct.

3    Q    And you complied with that order, correct?

4    A    I did.

5    Q    And, in fact, that was done by 5:00 o'clock the next day?

6    A    Correct.

7    Q    How did you get the funds?

8    A    I had to borrow them.

9    Q    So you owe somebody for that money?

10   A    Yes, I do.

11   Q    And are they expecting repayment?

12   A    Yes, they are.

13   Q    Okay.  Let's talk a little bit about what can happen here

14   today.  Do you understand the gravity of the situation?

15   A    I certainly do.

16   Q    You're familiar with the term, "the Court's inherent

17   power"?

18   A    Yes.

19   Q    You're familiar with the Court's ability under Section 105

20   of the Code?

21   A    Yes, I am.

22   Q    And you're familiar with the Court's ability to enforce

23   its Docket and police the actions of the attorneys to appear

24   before it?

25   A    Absolutely.

Clark - Cross / By Mr. Statham                          35

1   Q    Okay.  Now, the Court's essentially ordered the

2   disgorgement of the retainer.  So that remedy is not available

3   and you've complied with the Court's order.  There are other

4   things that can happen to you today.

5   A    I'm aware of that.

6   Q    Okay.  You could be fined monetarily further?

7   A    I understand that.

8   Q    Okay.  You could be barred from practicing before this

9   Court, obviously?

10  A    I understand that.

11  Q    You could also be required to forfeit away any right to

12  seek fees for the work that you have performed?

13  A    And I have no problem doing that.

14  Q    Very well.  You understand that there is the possibility

15  of a referral to the State Bar of Texas?

16  A    I understand that.  I have read that very carefully.

17  Q    And you also understand that there may be criminal

18  ramifications as well?

19  A    That is correct.

20  Q    You touched briefly on monthly operating reports.  You

21  didn't prepare them?

22  A    I did not.

23  Q    But they were filed during our watch?

24  A    Yes, they were.

25  Q    So ultimately that is your responsibility?

Clark - Cross / By Mr. Statham                                    36

1  A     Absolutely.

2  Q     One thing the Court had raised was the prospect of

3  criminal conduct under Title 18, specifically Section 153 of

4  the Code.  What is your response to that section or that

5  particular concern?

6  A     Well, I think in the Criminal Code, there has to be an

7  intent to commit a crime and I certainly had no intent to ever

8  commit a crime.  I was paid a retainer.  The purpose of the

9  retainer was to perform certain work and as my exhibit shows, I

10 performed $25,000, I think $774 worth of work against that

11 30,000-dollar retainer which included postage, copy, things of

12 that nature but there was certainly no intent at any time to

13 commit any sort of criminal act.

14 Q     Mr. Clark, you've been very forthcoming today with your

15 testimony in response to the Court's questions but something I

16 haven't heard completely is do you accept responsibility for

17 your actions and what's happened?

18 A     Absolutely.  I've stepped up the plate and admitted what I

19 did and what I didn't do and it's still my position today.

20 I've never varied.

21 Q     Very well.  Thank you.  Thank you, your Honor.

22         **THE COURT:**  Ms. Eisen, any questions?

23         **MS. EISEN:**  Just one question.

24 //

25 //

1                        **CROSS EXAMINATION**

2    **BY MS. EISEN:**

3    Q    On the 65-percent split that you have with Aaron Keiter,

4    is that on profits of the firm or is that on actual fees that

5    come in?

6    A    No, that's on fees.

7    Q    That's on fees.

8              **MS. EISEN:**  No further questions, your Honor.

9              **THE COURT:**  Let's take a ten-minute break and I'll

10   ask for statements or arguments from you-all.  I want to

11   ruminate for ten minutes.  So let's come back at quarter of

12   3:00.  Okay?  Thanks.

13        **(A recess was taken from 2:36 p.m. to 3:25 p.m.)**

14             **THE COURT:**  Okay.  We're back on the record.

15             **MR. CLARK:**  Your Honor, do you want me to take the

16   stand?

17             **THE COURT:**  No, you can take a seat.  Thanks,

18   Mr. Clark.

19             This is Lawrence J. Wedekind's Chapter 11 case, Case

20   Number 09-32057.  We're here on Docket 104 which is my Show

21   Cause Order.  We're also here on Docket 120 which is the U.S.

22   Trustee's Motion to Examine and Forfeit Fees before Injunctive

23   Relief.

24             Mr. Clark has given testimony.  Let me ask so that

25   we've got his record as clean as possible.  Ms. Eisen, do you

1    want to call any other witnesses for this joint hearing?

2              **MS. EISEN:**  No, your Honor.

3              **THE COURT:**  All right.  Mr. Statham, same question.

4              **MR. STATHAM:**  No, sir.

5              **THE COURT:**  Okay.  Then, Mr. Statham, why don't I

6    give you an opportunity to make any arguments you want and

7    then, Ms. Eisen, I'll give you the opportunity as well, please?

8    Thanks.

9              **MR. STATHAM:**  Briefly, your Honor, Mr. Clark has

10   disclosed what I believe to be fairly significant deviations

11   from his responsibilities as an attorney in violation of the

12   Bankruptcy Code and potentially the Texas Disciplinary Rules of

13   Professional Conduct.  I have to temper that with the fact that

14   he has been extremely candid and been very responsive to the

15   questions that have been posed by Counsel and the Court.

16   Despite that candor, it's still my belief that an appropriate

17   remedy needs to be a sanction of some kind for what's happened

18   because it's simply inexcusable to consistently deviate from

19   the rules in which -- or in the manner in which he has done.

20              The U.S. Trustee had proposed that in addition to the

21   disgorgement that the Court has already ordered a component of

22   the Court's sanction should include a complete forfeiture of

23   his ability to seek any fees for legal services that he has

24   rendered as well as an injunction against further practice

25   before this Court.  If Mr. Clark is prepared to spread that to

1    the remaining Courts in the Southern District, that certainly

2    is an acceptable alternative.  I would note for the record that

3    it appears that the disgorgement that he has offered appears to

4    be made on behalf of perhaps some other culpable parties given

5    the fee split that's been discussed today and I'd ask that that

6    be included in the Court's ultimate order.

7               **THE COURT:**  Thanks, Mr. Statham.

8               **MR. STATHAM:**  Yes, sir.

9               **THE COURT:**  Ms. Eisen?

10              **MS. EISEN:**  Yes, your Honor.  I, too, believe that my

11   client has been fully forthcoming with the Court and has

12   answered the questions that the Court posed to him today

13   truthfully and honestly and without being evasive or anything.

14   He is willing to accept the sanctions of no -- the injunction

15   of not practicing in this Court and disgorgement of the fees

16   and not seeking any further reimbursement for any time or

17   expenses that were spent in the Wedekind matter.  He did, as

18   Mr. Statham said, pay all of the funds back including those

19   that were paid allegedly to Mr. Keiter or, you know, would have

20   been attributable to Mr. Keiter's share to the Court within the

21   Court's order.

22              He has a few pending cases in other Courts in the

23   Southern District but he's not willing to extend the injunction

24   to all of the Courts in the Southern District at this time but

25   I don't think it's his intention for him to take a lot of new

1    cases in the Southern District as he's 76 years old and is

2    winding down his practice a lot anyway.  However, he has

3    represented to me, too, that he would in any future case if

4    something did arise, would certainly -- most certainly has

5    learned his lesson and will put any retainer-type funds in any

6    kind of bankruptcy matter or any other case into his trust fund

7    should he come across them.  His cases in criminal matters are

8    flat fees as he testified to the Court and in the divorce, they

9    are usually a different fee arrangement which have all been

10   acceptable to the State Bar.

11           We think that the sanctions that Mr. Statham has

12   imposed are certainly strict enough sanctions that -- to have

13   taught him his lesson and, you know, and to -- for the remorse

14   that he feels for misleading or whatever this Court believes

15   that, you know, happened here in this case.

16           **THE COURT:**  Thanks, Ms. Eisen.  I'm not going to make

17   any decision today.  I want to reflect on the testimony that

18   Mr. Clark has given.  I would like some additional information

19   that will help me.  So let me review that with you.  That's one

20   of the things I was doing in Chambers in trying to reflect.

21   Let me say this is a -- obviously I'm disturbed by what I heard

22   and so I want to reflect and I want this additional

23   information.

24           The testimony I heard I will try to temper with the

25   fact that Mr. Clark served honorably in the Korean theater

1    during the early 50s which I probably have more of an

2    appreciation of maybe than the average 55-year-old walking

3    around.  My father served in the Navy during that time period

4    and I just got through reading recently David Halberstam's book

5    about the Korean War -- or actually it's the Korean Conflict

6    because it was never declared to be a war but it was a horrific

7    conflict and I do have an appreciation for the fact that

8    Mr. Clark served in that theater and that he served his country

9    honorably which makes this even all the more of a painful

10   hearing and the fact that he's 76 years old although he doesn't

11   look it.  I'm sure there's a whole heck of a lot of people who

12   would like to have his youthful looks.

13          So let me get this additional information.  It'll

14   help me decide what to do.  I'd like to know what percentage of

15   practice Mr. Clark has had -- and why don't we say over the

16   last two years?  What percentage of his practice in terms of

17   gross revenues is bankruptcy versus family law versus criminal

18   law?  And we don't have to have exact figures.  I'm looking for

19   percentages.  So in the year 2008 and in the year 2009, you

20   know, if his gross revenues from his practice of law was, you

21   know, I pick a figure hypothetically -- 500,000.  I just need

22   to know 60 percent criminal, you know, 20 percent bankruptcy,

23   20 percent family law.  That will help me.

24          Second, I'd like an affidavit that can be submitted

25   in camera.  I would like the U.S. Attorney to get a copy of it

1  that sets forth his current financial status.  I'm talking

2  balance sheet, assets, liabilities.

3          **MS. EISEN:**  Your Honor, is that his personal or the

4  law firm?

5          **THE COURT:**  Both.  Once again though, in camera to me

6  and to Mr. Statham and it just should be an affidavit saying

7  it's -- you know, attached hereto as a balance sheet.  If the

8  law firm has had audited or unaudited, certainly attach them

9  and again I'm going back -- the balance obviously is, you know,

10 as current as it can be, any P&L for the last two years,

11 audited or unaudited, if they exist.

12         I would like also a year's statements -- last year's

13 for 2009 up until today, the -- just the bank statements,

14 copies of the bank statements for the trust account and the

15 operating account.  I don't need to see all the checks.  I just

16 want to look at balances and then I'd like a list of the

17 Chapter 11s for which Mr. Clark has been Counsel of Record.  If

18 you can't remember them all, do the best you can.

19         **MR. CLARK:**  Your Honor, may I ask you a question?

20         **THE COURT:**  Sure, Mr. Clark, please.

21         **MR. CLARK:**  What period of time?

22         **THE COURT:**  Going back to -- I think you testified

23 since 2000.  Just do the best you can to list them out.  And

24 then also set forth, if you can remember, Mr. Clark, the name

25 of the case in which Judge Steen imposed sanctions.  And if you

1    can just submit that information to me in camera in Chambers

2    and copy to Mr. Statham and, Ms. Eisen, I guess I would request

3    that you just write a cover letter attaching those documents.

4         **MS. EISEN:**  Okay.

5         **THE COURT:**  And what I will do is I will look at that

6    information and I'm going to reflect on the testimony and I may

7    have some additional questions.  I don't know.  What I'm going

8    to do is give a continued hearing on this which we may or may

9    not need but at least let me get it down on the Docket and it

10   may be that I just come out and give you my ruling verbally.  I

11   don't know.

12         Today is March the 16th.  Why don't I give you until

13   the end of the month, March 31, to get the documents to myself

14   and Mr. Statham?  Why don't we set a -- or why don't we say

15   continue this hearing until April 16?  That's a Friday, one

16   month from today at --

17         **THE CLERK:**  3:30.

18         **THE COURT:**  -- 3:30.  Excuse me.  Make it 4:00

19   o'clock.  Make it 4:00 o'clock on that Friday -- Friday, April

20   16, 2010 at 4:00 o'clock.

21         Mr. Statham, the only other thing I would ask you is

22   if you would inquire of Mr. Jayson whether he has drawn down

23   his retainer.

24         **MR. STATHAM:**  I will do so.  Do you prefer a status

25   report of some kind or how do you wish this to be communicated?

44

1          **THE COURT:**  I think if you would just file a status

2    report that you communicated with him and that either he has

3    said he has drawn down or he has not drawn down.

4          **MR. STATHAM:**  Very well.

5          **THE COURT:**  Are there any other issues you want to

6    raise today?

7          **MR. STATHAM:**  No, sir, not at this time.

8          **THE COURT:**  Ms. Eisen?

9          **MS. EISEN:**  No, sir, your Honor.

10          **THE COURT:**  Mr. Clark?

11          **MR. CLARK:**  No, your Honor.  I'm satisfied.

12          **THE COURT:**  Thank you.  I appreciate you-all.

13    Mr. Statham, I appreciate that you did the motion and the

14    exhibits.  Ms. Eisen, I appreciate your preparation as well.

15    Mr. Clark, I'm happy that you came in and gave the testimony

16    forthrightly.

17          **MR. CLARK:**  Thank you, your Honor.

18          **THE COURT:**  As I said, it's a hard -- it is hard for

19    me to take action against someone who has served like you have

20    but I'll do the best I can and fulfill my duty as best I can.

21    I need this additional information.  All right.

22          **MS. EISEN:**  Your Honor, just one other point of

23    reference, too.  He is in the process of winding down his

24    practice and --

25          **THE COURT:**  I did hear that and I've noted it down.

1          **MS. EISEN:**  Right.

2          **THE COURT:**  That does -- that's an element that I

3   need to know.  So thank you-all.

4          **MR. CLARK:**  Also, your Honor, I might add and moving

5   out of Houston.

6          **THE COURT:**  All right.  Thank you, Mr. Clark.

7          **MR. CLARK:**  Going back to my hometown.

8          **THE COURT:**  All right, thanks.

9          **MS. EISEN:**  May we be excused, your Honor?

10          **THE COURT:**  Please.

11      **(This proceeding adjourned at 3:37 p.m.)**

12

13

14

15

16

17

18

19

20

21

22

23

24

25

## CERTIFICATION

I certify that the foregoing is a correct transcript from the electronic sound recording of the proceedings in the above-entitled matter.


_____                    March 23, 2010
              Signed                                       Dated


                    *TONI HUDSON, TRANSCRIBER*